FILED
**United States Court of Appeals**
**Tenth Circuit**

**December 21, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

CLIFFORD CURRIE,

     Defendant - Appellant.

No. 17-3242

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:16-CR-20089-JAR-1)**
_____

Paige A. Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender with her on the briefs), Topeka, Kansas, for Defendant - Appellant.

Carrie N. Capwell, Assistant United States Attorney (Stephen R. McAllister with her on the brief), Kansas City, Kansas, for Plaintiff - Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **LUCERO**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

A jury found Clifford Currie guilty of assault with intent to commit murder. The facts are undisputed. Mr. Currie splashed gasoline on his supervisor, lit her on fire, attempted to stand on her neck, and attacked her with a straight razor and scissors. On

appeal, he argues prosecutorial misconduct during closing arguments denied him a fair trial. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. **BACKGROUND**

### A. *Mr. Currie's Working Relationship with Lt. Blanchard*

Mr. Currie worked as a social services assistant at the Munson Army Health Center ("Munson") at Fort Leavenworth, Kansas. Lieutenant Katie Ann Blanchard, a registered nurse with the army, supervised him.

Mr. Currie and Lt. Blanchard had a difficult working relationship. Mr. Currie managed a program that received a failing grade in August 2015 after an accreditation inspection. When Lt. Blanchard criticized Mr. Currie's organizational skills and filing practices in early January 2016, he "became very aggressive," told her to "get the f--- away," and "came after" her. ROA, Vol. I at 526-27. When Lt. Blanchard threatened to call a "Code Green"—used when a hostile person in the hospital needs to be "taken down"—Mr. Currie stopped approaching her and slammed his door shut. *Id.* at 527.

Lt. Blanchard proposed that Mr. Currie receive a seven-day suspension for his outburst. She documented Mr. Currie's professional shortcomings and frequently complained about him to Munson's HR department.

On July 27, 2016, Mr. Currie sent a letter to Major Sashi Zickefoose, his second-line supervisor, formally responding to the proposed seven-day suspension. The letter recounted Mr. Currie's views about Lt. Blanchard: "Each and every day that she addresses me in her condescending tone, and her up in my personal space/face attitude, I feel intimidated, emotionally distraught, nervous and anxious. Because of her continued

2

mistreatment of me, I have had to seek professional counseling and have had to get on medication." Supp. ROA, Vol. II, Exh. 801 at 2. He noted that he had "never been in trouble before" and "this 7 day suspension would affect [his] family's financial well-being." *Id.*

In an August 3, 2016 email to Major Zickefoose, Mr. Currie requested a new supervisor and referenced previous conversations with the major about Lt. Blanchard "regarding continual berating, scolding, being spoken to in a condescending manner, disrespected, intimidated, treated like a subhuman, and generally threatened." *Id.*, Exh. 802 at 1.

Also in August, based on Lt. Blanchard's safety concerns, Army command decided that she should have another employee present whenever she met with Mr. Currie, including during their daily meetings. On August 15, 2016, Lt. Blanchard referred Mr. Currie to the Employee Assistance Program for his "unsatisfactory work performance," unresponsiveness to "mentorship/guidance," and "aggressive behavior." Supp. ROA, Vol. II, Exh. 827 at 1.

On September 6, 2016, the day before the assault, Mr. Currie sent himself an email stating, "I don't think [Lt. Blanchard] has your best interests in mind . . . . [S]he is vindictive enough to try to sabotage you because she is trying to lay in wait and get the position herself." Supp. ROA, Vol. II, Exh. 836. He warned himself that Lt. Blanchard "will do anything necessary to prevent you from [keeping your job]." *Id.* He concluded, "Edit this before you send it out. Make sure to stay respectful and only indicate what is true and valid." *Id.*

3

## B. *September 7, 2016 Assault*

During a September 7 meeting with Mr. Currie, Lt. Blanchard explained the mistakes she found in one of his reports. When Lt. Blanchard asked Mr. Currie if he understood the problem, he responded, "You, you are the problem." ROA, Vol. I at 540. As he left her office, Mr. Currie told Lt. Blanchard, "You need to come to my office, I need to show you something." *Id.* Lt. Blanchard testified that she believed the invitation was "very suspicious" because Mr. Currie "usually didn't like [her] in his space at all." *Id.* She declined his invitation and warned Mr. Currie that she would call a "Code Green" if he did not leave her office.

At 5:00 p.m., Lt. Blanchard and a colleague went to Mr. Currie's office and dismissed him for the day, reminding him he could not receive overtime pay for staying late.[1] Lt. Blanchard then returned to her office.

Approximately 10 minutes later, Mr. Currie stepped inside Lt. Blanchard's office. He threw gasoline at her from a water bottle and lit her on fire. Lt. Blanchard ran to the hallway, where her screams summoned Nurse Deanne Killian, who attempted to pat out the flames. Mr. Currie pushed Ms. Killian aside, tried to stab Lt. Blanchard with a straight razor and scissors, and attempted to put his foot on her neck. A sergeant in the hospital heard the commotion and eventually subdued Mr. Currie.

---

[1] Lt. Blanchard had previously denied Mr. Currie's requests for overtime pay, and Mr. Currie had expressed frustration about the denial.

4

## C. *The Investigation*

Firefighters arrived and asked witnesses about the accelerant Mr. Currie used. A sergeant who was sitting with Mr. Currie in the other room overheard Mr. Currie say, "It's gasoline, you idiots." ROA, Vol. I at 619.

Police responded and searched Mr. Currie, finding he possessed a book of matches. There was no evidence that Mr. Currie smoked. A later investigation revealed a pair of scissors and a straight razor that Ms. Killian had kicked into her office during the incident; two burned match sticks and burnt plastic residue in Lt. Blanchard's office; and a uniform, blankets, and a lab coat in the hallway. A search of Mr. Currie's office produced a double-edged razor blade, a bottle cap that smelled like gasoline, and Mr. Currie's cell phone. A search of Mr. Currie's home yielded a tin containing several books of matches—the same brand as those found in his possession.

An FBI examination of Mr. Currie's phone revealed the following May 8, 2016 searches on Yahoo Answers or Quora:[2]

(1) "How long would it take to die if one of your external jugular vein[s] was slit?"

(2) "How long does it take to die after a jugular vein has been cut?"

(3) If you cut someone in the neck with a knife . . . how long will it take until they die?"

---

[2] At trial, an FBI agent testified that these sites are "community-generated forums in which computer users can pose a question" and receive answers from other users. ROA, Vol. I at 998.

(4)     "How long would it take to die from a major artery or vein cut?"

ROA, Vol. I at 996-1000.

## D.  *Trial Proceedings*

A grand jury indicted Mr. Currie for (Count 1) knowingly and intentionally assaulting Lt. Blanchard with intent to commit murder, in violation of 18 U.S.C. § 113(a)(1), and (Count 2) knowingly and intentionally assaulting Ms. Killian with a dangerous weapon, in violation of 18 U.S.C. § 113(a)(3).

At trial, Mr. Currie requested a jury instruction on the lesser included offense of attempted voluntary manslaughter.  Relatedly, he requested instructions consistent with a heat-of-passion defense and specifically asked the court to include the absence of heat of passion as an element of assault with intent to commit murder.  The district court denied Mr. Currie's specific request but agreed there was "more than sufficient evidence of heat of passion" to send the heat-of-passion question to the jury.  ROA, Vol. I at 1308-11.

Accordingly, on Count 1, the district court gave Instruction No. 12, which listed the elements of assault with intent to commit murder, and Instruction No. 13, which read:

> The intent to commit murder is more than the intent to kill.  Murder is the unlawful killing of a human being with malice.  To establish malice the prosecution must prove beyond a reasonable doubt the absence of a heat of passion.
>
> Even if you find beyond a reasonable doubt that the defendant acted with the intent to kill [Lt. Blanchard], you must find him not guilty of Count 1 unless you also believe that the prosecution proved the absence of heat of passion beyond a reasonable doubt.

6

ROA, Vol. I at 413. Instruction No. 14 defined "malice." Instruction No. 15 listed the elements of attempted voluntary manslaughter. Instruction No. 16 explained the meaning of an attempt to kill intentionally. Instruction No. 17 stated: "Heat of passion means a passion, fear, or rage in which the defendant loses his normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force." ROA, Vol. I at 417. Finally, Instruction No. 18 explained:

> The difference between assault with intent to commit murder and attempted voluntary manslaughter is that, to convict the defendant of attempted voluntary manslaughter, the government does not have to prove that the defendant acted with malice. Malice is an element of assault with intent to murder, but not of attempted voluntary manslaughter.

ROA, Vol. I at 418.

During closing argument, defense counsel relied exclusively on the heat-of-passion defense, arguing Mr. Currie was guilty of attempted manslaughter but not assault with intent to commit murder. He argued there was a dividing line between "head crimes" and "heart crimes" and highlighted the evidence of Mr. Currie's stressful relationship with Lt. Blanchard. Supp. ROA, Vol. I at 14-15, 18-20. The jury convicted Mr. Currie of assault with intent to commit murder. It acquitted him of assault with a deadly weapon against Ms. Killian.

After his guilty verdict, Mr. Currie filed a motion for acquittal and a new trial, arguing that prosecutorial misconduct deprived him of a fair trial. His motion challenged nine of the prosecutor's statements during closing argument and rebuttal. On appeal, Mr.

7

Currie groups the statements into three categories, arguing the prosecutor (a) misstated the burden of proof for assault with intent to commit murder, (b) misstated the heat of passion defense, and (c) improperly warned the jury about legitimizing violence. Aplt. Br. at 2. We quote each of the comments in the analysis section below.

### E. *Sentencing Hearing*

The district court denied Mr. Currie's motion for a new trial at the sentencing hearing. It found one of the prosecutor's comments was "essentially a misstatement of the law." ROA Vol. II at 19. But it did not find any of the other comments to be improper and did not find that Mr. Currie's substantial rights were affected by the comments. *Id.* at 24. The court sentenced Mr. Currie to the statutory maximum of 20 years of imprisonment.

## II. **DISCUSSION**

The sole question on appeal is whether the prosecutor's comments rose to the level of prosecutorial misconduct and deprived Mr. Currie of a fair trial.[3]

### A. *Legal Background*

To answer this question, we detail (1) the substantive criminal law pertaining to this case, (2) the prosecutorial misconduct law of this circuit, and (3) the applicable standards of review.

---

[3] Mr. Currie challenges the comments individually, but he also suggests they may have had a cumulative effect on the fairness of his trial. *See* Aplt. Br. at 26.

1. **Substantive Criminal Law**

Mr. Currie was convicted of assault with intent to commit murder under 18 U.S.C. § 113(a)(1).[4] The district court also instructed the jury on the lesser included offense of attempted voluntary manslaughter under 18 U.S.C. §§ 1112 (manslaughter) and 1113 (attempt).

    a. *Assault with intent to commit murder*

Because 18 U.S.C. § 113(a)(1) is an attempt crime, it requires "a specific intent to kill the victim . . . . [A]cting with malice by committing a reckless and wanton act without also intending to kill the victim is not sufficient for conviction." *United States v. Perez*, 43 F.3d 1131, 1138 (7th Cir. 1994); (quoting *United States v. Jones*, 681 F.2d 610, 611 (9th Cir. 1982)); *see United States v. Davidson*, 597 F.2d 230, 232 (10th Cir. 1979) (affirming attempted murder conviction based on circumstantial evidence of specific intent); *see also United States v. Cooper*, 812 F.2d 1283, 1284 (10th Cir. 1987) (explaining "assault with intent to commit murder" under § 113(a) is a specific intent crime). Accordingly, to prove assault with intent to commit murder, the government must establish the intent required for a completed murder offense: an intent to kill. *Perez*, 43 F.3d at 1138.

---

[4] Attempted murder is separately proscribed in 18 U.S.C. § 1113 "[e]xcept as provided in section 113." Like the district court and the parties, we sometimes refer to Mr. Currie's offense of assault with intent to commit murder as "attempted murder."

b. *Murder and manslaughter*

Federal law recognizes a hierarchy of homicide offenses. *See United States v. Serawop*, 410 F.3d 656, 662 (10th Cir. 2005). Murder "is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a).[5] Voluntary manslaughter "is the unlawful killing of a human being without malice . . . [u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). The key element separating murder from voluntary manslaughter is malice, which "is not satisfied simply by killing with an intentional or reckless mental state; instead, malice specifically requires committing the wrongful act without justification, excuse, or mitigation." *Serawop*, 410 F.3d at 664.

c. *Heat of passion*

A heat-of-passion finding negates malice. *Id.* Thus, a defendant is guilty of voluntary manslaughter—and not murder—when he or she commits an:

---

[5] The federal murder statute provides:

> Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

18 U.S.C. § 1111(a).

10

> intentional killing that is nonetheless deemed to be without malice because it occurs in what the courts called "the heat of passion," a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances that would provoke such a passion in an ordinary person, but which did not justify the use of deadly force.

*Id.* at 664-65 (quoting *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989)). A heat of passion defense has both a subjective and an objective element: the defendant must subjectively have been in a heat of passion, and the provocation must be substantial enough to cause a reasonable person to have "such a passion." *See id.*; 2 Wayne R. LaFave, Substantive Criminal Law § 15.2 (3d ed. 2018).

When the defendant has proffered sufficient heat-of-passion evidence, "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation." *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975). In considering jury instructions, we have elaborated that "clarity is essential in a murder case with a heat of passion defense." *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985). In *Lofton*, we found the district court had erred in instructing the jury on a heat of passion defense by mentioning it "only in the manslaughter instruction, which did not advise the jury that this was Lofton's sole defense to murder." *Id.* at 921.

We consider Mr. Currie's prosecutorial misconduct arguments against this substantive backdrop.

## 2. **Prosecutorial Misconduct**

Prosecutorial misconduct violates a defendant's due process rights if it infects a trial with unfairness and denies the defendant the right to a fair trial. *United States v.*

11

*Anaya*, 727 F.3d 1043, 1052 (10th Cir. 2013).[6]  The misconduct analysis proceeds in two

steps:  (1) we decide whether the prosecutor's comments were improper, and (2) if they

were, we examine the likely effect of the comments on the jury's verdict.  *See United*

*States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011).

> a.  *Step one:  propriety of the prosecutor's comments*

Prosecutorial misconduct can include various types of improper comments at trial.

*See, e.g.*, *Prosecutorial Misconduct*, 34 Geo. L.J. Ann. Rev. Crim. Proc. 563, 564-67

(2005) (detailing forms of misconduct).  For example, "it is improper for the prosecution

to misstate the law in its closing argument."  *United States v. Hollis*, 971 F.2d 1441, 1455

(10th Cir. 1992); *see Le v. Mullin*, 311 F.3d 1002, 1016 (10th Cir. 2002).

In addition, a prosecutor may not encourage the jury to "address societal ills" in

reaching its verdict.  *United States v. Taylor*, 514 F.3d 1092, 1095 (10th Cir. 2008); *see*

*also Wilson v. Sirmons*, 536 F.3d 1064, 1120 (10th Cir. 2008) ("It is improper for a

prosecutor to suggest that a jury has a civic duty to convict." (quotations omitted)).  A

prosecutor's statements "about the need to address societal ills speak not to the question

whether the accused committed the crime alleged, but divert attention from that

---

[6] Prosecutorial misconduct can cause constitutional error in two ways. *Underwood v. Royal*, 894 F.3d 1154, 1167 (10th Cir. 2018).  First, it can prejudice a specific constitutional right, amounting to a denial of the right.  *Id.*  Second, "absent infringement of a specific constitutional right, a prosecutor's misconduct may in some instances render a . . . trial 'so fundamentally unfair as to deny [a defendant] due process.'"  *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)); *see Anaya*, 727 F.3d at 1052-53.  Mr. Currie does not argue the comments deprived him of any specific constitutional right.  We therefore address only the second type of prosecutorial misconduct.

dispositive question and confuse the task of the jury—as finder of fact—with the task of elected officials—as the authors of social policy." *Taylor*, 514 F.3d at 1095. In *Taylor*, we found improper the prosecutor's statement that the jury should convict the defendant to "end the cycle of violence" on the Southern Ute Indian reservation. *Id.*;[7] *see also United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991) (discussing impropriety of prosecutors' appeals to jury for help to fight the "War on Drugs").

We examine alleged improper comments in context. *United States v. Young*, 470 U.S. 1, 11 (1985). "We have repeatedly recognized that considerable latitude is given [to] the prosecutor in closing argument in replying to an argument raised by defense counsel's closing statement." *United States v. Janus Indus.*, 48 F.3d 1548, 1558 (10th Cir. 1995); *see United States v. Robinson*, 485 U.S. 25, 31 (1988); *Fleming*, 667 F.3d at 1105. And courts "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning." *Donnelly*, 416 U.S. at 647.

b. *Step two: effect on jury's verdict*

When a court determines that a prosecutor made an improper comment, it then assesses whether the comment deprived the defendant of a fair trial. *See Taylor*, 514 F.3d at 1096-97. In doing so, we "consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case." *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996) (quotations omitted);

---

[7] We nonetheless affirmed the defendant's conviction at the second step of our prosecutorial misconduct analysis. *Taylor*, 514 F.3d at 1094.

*see also Taylor*, 514 F.3d at 1100-01 (finding district court's instruction immediately after improper comment cured prejudicial effect).

We assess a prosecutor's misstatement of law along with other statements about the law made during trial. *See Le*, 311 F.3d at 1018-19. First, we examine the jury instructions. *Id.* In this as in other contexts, "[t]he jury is presumed to follow its instructions, even when there has been misleading argument." *Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006) (citation omitted); *see United States v. Erickson*, 561 F.3d 1150, 1169 (10th Cir. 2009). Second, we consider any curative instructions the court may have given in response to the prosecutor's comments. *Le*, 311 F.3d at 1018 n.8. A court's refusal to correct a prosecutor's misstatement of law may affect the prejudicial effect of the comment. *See Mahorney v. Wallman*, 917 F.2d 469, 473 n.4 (10th Cir. 1990) ("[T]he judge's refusal twice to correct the prosecutor's misstatements when publicly requested to do so gave such statements some appearance of judicial approval."). Finally, a misstatement of law has less prejudicial effect when the prosecutor correctly states the law at other points in closing argument. *See Neill v. Gibson*, 278 F.3d 1044, 1053 (10th Cir. 2001) (acknowledging prosecutor's misstatement of law but concluding "his argument as a whole did not mislead the jury").

3. **Standards of Review**

When considering improper prosecutor comments on appeal, the appropriate standard of review depends on whether the defendant objected at trial and how the court responded. *Anaya*, 727 F.3d at 1052-53. In *Anaya*, we identified the standard of review for four situations: (1) the defendant objects and the court overrules the objection—de

novo review; (2) the defendant objects, the district court takes curative action, and the defendant objects to the adequacy of the curative action or asks for a mistrial—abuse of discretion review; (3) the defendant objects, the district court sustains the objection, and the defendant fails to object to the adequacy of the curative action—plain error review; and (4) the defendant does not object at trial but raises the issue on appeal—plain error review. *Id.* This case presents comments falling into categories one and four.

Under de novo review, we "first decide whether the conduct was improper and then, if so, whether the *Government* has demonstrated that error was harmless beyond a reasonable doubt." *Id.* at 1052 (quotations omitted) (emphasis added). Under plain error review, "reversal is warranted only when [1] the prosecutor's statement is *plainly improper* and (2) the *defendant* demonstrates that the improper statement affected his or her substantial rights." *Id.* at 1053 (quoting *Fleming*, 667 F.3d at 1103) (emphasis added). To be plain, an error must be "clear" or "obvious," meaning it is contrary to well-settled law. *Taylor*, 514 F.3d at 1100.

At trial, Mr. Currie objected to one comment only. Because the district court denied the objection, we review that comment de novo. *Anaya*, 727 F.3d at 1052. We review the remaining comments for plain error because Mr. Currie failed to object to them. *Id.* at 1053.

### B. *Analysis*

As discussed above, Mr. Currie argues there were three categories of improper comments. We list the nine comments below and address the categories in turn, assessing the propriety of each comment before proceeding to the prejudice analysis.

15

Although we conclude the prosecutor misstated the law in Comments 1 and 2, when viewed in the context of the entire record, those two comments did not deprive Mr. Currie of a fair trial and therefore did not affect his substantial rights. We find Comments 3-6 and 8-9 not plainly improper and Comment 7 not improper.

1. **Step One: Propriety of the Prosecutor's Comments**

    a. *Comments on burden of proof for assault with intent to commit murder*

    The two comments about the Government's burden were:

> **(1)** **<u>Closing Argument</u>**: "[Y]ou have to unanimously find the defendant not guilty of Count 1 before you look at the heat of passion and voluntary manslaughter."

Supp. ROA, Vol. I at 10.

> **(2)** **<u>Rebuttal</u>**: [A]nd only if you find that he didn't plan [for months to kill Lieutenant Blanchard] do you even look at the question of whether this was a heat of passion.

    *Id.* at 48-49.

These comments were plainly improper. Stating that the jury should not consider "heat of passion" until and unless it finds Mr. Currie not guilty of Count 1 contradicted the Government's burden to prove *lack* of a heat of passion beyond a reasonable doubt. *Mullaney*, 421 U.S. at 704. As Mr. Currie notes, the prosecutor's statement is nearly identical to the jury instruction we reversed in *Lofton*. 776 F.2d at 922. Here, as in *Lofton,* instead of telling the jury that it must find lack of heat of passion to convict for attempted murder, the prosecutor told the jury to consider heat of passion only if it did

16

not find Mr. Currie guilty of attempted murder.  As the district court properly noted, this argument was "essentially a misstatement of the law."  ROA Vol. II at 19.

      b.  *Comments on the heat-of-passion standard*

Mr. Currie argues that three comments misstated the heat-of-passion standard.  We conclude that none were plainly improper.

> **(3)**     **<u>Closing Argument</u>**:  The inquiry for you then is to determine would an ordinary and reasonable person be that provoked and take those kinds of actions.

Supp. ROA, Vol. I at 9.

> **(4)**     **<u>Rebuttal</u>**:  Instruction No. 17 says that if you're involved in a heat of passion, if you do lose your temper and—and you feel provoked, it has to also provoke an ordinary and a reasonable person.  Would a reasonable person standing in Mr. Currie's shoes be so provoked that he would've committed the acts that he did on September 7th?  And the answer is no.

*Id.* at 42.

> **(5)**     **<u>Rebuttal</u>**:  The judge's instructions will tell you that it's not enough that the defendant was angry or upset or that he felt provoked.  It's whether or not somebody in his shoes, somebody standing in the defendant's shoes, a reasonable and ordinary person would've been so provoked that they would've taken similar actions.  And that's just not something you can find.

*Id.* at 49-50.

As the district court stated in Instruction No. 17, "Heat of passion means a passion, fear, or rage in which the defendant loses his normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force."  ROA, Vol. I at 417.  It also instructed in Instruction No.

13, "To establish malice the prosecution must prove beyond a reasonable doubt the absence of heat of passion." *Id.* at 413. Here, Mr. Currie was accused of assault with intent to commit murder, a specific intent crime requiring proof that Mr. Currie intended to kill. *See Braxton v. United States*, 500 U.S. 344, 351 n.* (1991) ("Although a murder may be committed without an intent to kill, an *attempt to commit murder requires a specific intent to kill*." (emphasis added) (quotations omitted)).

The prosecutor's comments did not misstate the law. Comments 3 and 5 asked the jury to consider whether a reasonable person would commit "similar actions" or "those kinds of actions." Because heat of passion includes an objective element, it was appropriate for the jury to consider whether an ordinary person under Mr. Currie's circumstances would have reacted in a *similar* manner, that is, would have lost control and tried to kill Lt. Blanchard. *See Serawop*, 410 F.3d at 658.

Comment 4 is a closer call but was not plainly improper. It responded to Mr. Currie's argument that merely "losing self-control" is sufficient for a heat of passion defense. *See Robinson*, 485 U.S. at 31 (granting prosecutor leeway to respond to defendant's arguments). First, the prosecutor referred the jury to Instruction No. 17, which properly defined heat of passion. Second, she stated that "heat of passion" contains an objective element, which it does. *See Serawop*, 410 F.3d at 665. Third, she asked whether "a reasonable person standing in Mr. Currie's shoes [would've been] so provoked that he would've committed the acts that he did on September 7th." Supp. ROA, Vol. I at 42. Although the law does not require the jury to find that a reasonable person would have reacted exactly as Mr. Currie did, *see Serawop*, 410 F.3d at 664-65,

18

when viewed in context, the prosecutor's point was that Mr. Currie's alleged provocation based on workplace frustrations was not objectively reasonable.

c. *Comments on community violence*

The prosecutor made all four comments about "legitimizing violence" during rebuttal argument. Mr. Currie objected to Comment 7, so we review its propriety de novo because the district court overruled his objection. Comment 7 was not improper and Comments 6, 8, and 9 were not plainly improper.

**(6)** **Rebuttal**: Well, we need to clear up one thing. Heat of passion doesn't mean you lose your temper. You just lost your temper and, therefore, you're enraged and, therefore, you can do whatever you want to do. Because if that were the case, if that were the law, then hotheads all over the country when they get cut off in traffic would be justified in shooting at their victim.

Supp. ROA, Vol. I at 41-42.

**(7)** **Rebuttal**: And if—if a boss trying to correct your work and help you with a report is something that can cause a heat of passion attack like this, then bosses all over this country are going up in flames.

*Defense Counsel*: Objection. May we approach?

*The Court:* All right.

*Defense Counsel*: That's misconduct. She's asking for community protection by saying if you get— (reporter interruption). It's an improper basis for closing argument, arguing that a verdict for attempted voluntary manslaughter means that bosses are going to go up in flames around the country. That is—

*Prosecutor*: That's not what I said, Judge. I said that if that is the standard, if the standard is you can just lose your temper and—and that's the only portion of

19

heat of passion that's relevant is that you, yourself, are subjectively losing your temper—

*The Court*: Right. I didn't—I didn't hear a community—appeal to the community. I heard sort of an analogy is what I heard. So I'll overrule the objection.

Supp. ROA, Vol. I at 44-45.

(8) **Rebuttal**: That is not the standard. As I said, if that's the standard, your boss can't correct you and expect that you will act as a reasonable person, then that would justify these types of attacks.

*Id.* at 45-46.

(9) **Rebuttal**: He had the right to do a lot of things, but he didn't have the right to try to kill her.

*Id.* at 46.

Viewed in context, the prosecutor's comments came in response to defense counsel and addressed the objective element of Mr. Currie's heat-of-passion defense. *Serawop*, 410 F.3d at 664-65.

During closing argument, defense counsel explained the heat of passion as follows:

But if there is heat of passion, if the heart is involved, if it's emotional, if it's rageful, then that means there isn't malice. . . . If there is heat of passion, if there is anger, if there's emotion, if the heart is involved and your head is not functioning right, then that's not malice. All right? That's heat of passion. . . .

[This case is] about the circumstances. Right? The circumstances. And the instruction tells you if those circumstances would cause someone to lose their temper, to lose their self-control where their brain is not really in control

20

> of—of itself anymore and you're acting on emotion, then it becomes a heart crime.

Supp. ROA, Vol. I at 16-17.

On appeal, Mr. Currie argues that the prosecutor set up "a straw-man defense never argued by Mr. Currie ('a boss trying to correct your work' justifies violent acts) in order to repeatedly warn the jurors that if they acquitted Mr. Currie . . . they would both incite and create a legal right to commit road-rage shootings and send bosses up in flames." Aplt. Br. at 31. But the prosecutor's comments did not address a "straw man." They addressed Mr. Currie's sole defense, which equated the "heat of passion" with "anger" and "emotion," and which relied on convincing the jury that developing a rage based on the "circumstances" of his professional interactions with Lt. Blanchard was objectively reasonable. Supp. ROA, Vol. I at 16.

The prosecutor properly responded to Mr. Currie's assertions (quoted above) by drawing the jury's attention to the objective element of the heat-of-passion argument. *See Janus Indus.*, 48 F.3d at 1558 (giving prosecutor "considerable latitude" to respond to defense counsel's closing arguments). The prosecutor did not evoke broad societal ills such as the War on Drugs or violence on an Indian reservation. She instead contrasted common daily frustrations with the unreasonableness of Mr. Currie's reaction to them. Accordingly, as the district court correctly found, the prosecutor's comments were "sort of an analogy" that highlighted the objective unreasonableness of Mr. Currie's legal argument. *See* Supp. ROA, Vol. I at 44-45.

The references to "hotheads all over the country" and "bosses . . . going up in flames" contained strong language, but we do not find them improper as rebuttal comments and in light of the objective-reasonableness issue the prosecutor was attempting to address.[8]

## 2. **Step 2: Effect on the Jury Verdict**

Our step-one analysis of the prosecutor's comments has identified as plainly improper Comments 1 and 2, which misstated the law regarding the prosecution's burden to prove assault with intent to commit murder. Because Mr. Currie did not object to these comments at trial and our review is for plain error, he must show that "the improper statement[s] affected his [] substantial rights." *Anaya*, 727 F.3d at 1053. Considering the overwhelming evidence of Mr. Currie's premeditation, the jury instructions, and the prosecutor's articulation of the law at other points during closing, we conclude that Mr. Currie has not shown that the two improper comments affected the jury verdict.[9]

### a. *Overwhelming evidence*

The evidence was overwhelming that Mr. Currie's assault on Lt. Blanchard was premeditated and did not occur in the heat of passion. In May 2016, months before the

---

[8] Even if we assumed the prosecutor's statements were improper and called for a step-two prejudice analysis, we would find lack of prejudice for the reasons stated in the next section. *See Fleming*, 667 F.3d at 1106.

[9] Mr. Currie does not specifically argue for cumulative error, though he does assert that he is able to establish prejudice "from any or all of the prosecutor's misconduct." Aplt. Br. at 36. Even if this statement properly invokes our cumulative error doctrine, we conclude Mr. Currie has not shown that Comments One and Two either individually or together affected the jury's verdict. *See United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc).

assault, Mr. Currie searched disturbing questions on his phone, including "How long does it take to die after a jugular vein has been cut?" ROA, Vol. I at 1000. Consistent with that question, he used a straight razor and scissors to assault Lt. Blanchard, and he attempted to stand on her neck.

On September 6, the day before the attack, Mr. Currie wrote himself a long email referring to himself in the third person and detailing his grievances against Lt. Blanchard. "She doesn't have your best interests in mind," he wrote. Supp. ROA, Vol. II, Exh. 836. Early the next day, he told Lt. Blanchard, "[Y]ou, you are the problem" after a contentious interaction between them. ROA, Vol. I at 540. He then invited her into his office, an invitation that Lt. Blanchard declined and found "suspicious" given their history. *Id.* at 540-41.

Further, the evidence of provocation was weak. In their last interaction before the assault, Lt. Blanchard told Mr. Currie that he could not be paid overtime for working past 4:30 p.m. In closing argument, Mr. Currie's counsel described this interaction as the "final straw" in a long line of stressful interactions. Supp. ROA, Vol. I at 32. But despite this characterization, Mr. Currie did not react immediately to the comment. Instead, he remained in his office and waited approximately 10 minutes before proceeding to Lt. Blanchard's office, where he could confront her alone. Although the district court concluded the evidence was sufficient to send the heat-of-passion question to the jury, the professional nature of Lt. Blanchard's "final straw" statement—relating to his eligibility for overtime pay—and the elapsed time between that statement and the assault significantly undercut the reasonableness of Mr. Currie's "passion."

23

Finally, the method of the assault itself dispelled heat of passion. Mr. Currie needed to fill up a water bottle with gasoline to complete the act, a step that took time and planning. He brought a pack of matches from his home to work, although there is no evidence that he was a smoker. Finally, he found a straight razor and brought it to his office. Mr. Currie had a very large beard at the time of the assault, making it improbable that he brought the razor to shave. These acts left little doubt that Mr. Currie planned his attack and did not act in the heat of passion.

b. *Jury instructions*

Mr. Currie does not challenge the jury instructions, which properly stated the law of assault with intent to commit murder, attempted voluntary manslaughter, and heat of passion. The district court explained the applicable law and instructed the jury to follow it (Instruction No. 1). It detailed the elements of assault with intent to commit murder (Instruction No. 13), including the requirement that "[t]o establish malice the prosecution must prove beyond a reasonable doubt the absence of heat of passion." ROA, Vol. I at 413. It then explained the corresponding heat of passion defense (Instruction No. 17) and the difference between attempted murder and attempted manslaughter (Instruction No. 18).

The court also gave standard instructions informing the jury that "it would be a violation of your sworn duty to base a verdict upon anything but the evidence in, and the law applicable to, this case" (Instruction No. 28). ROA Vol. I at 428. "We presume the jury follows its instructions in the absence of an overwhelming probability to the contrary." *United States v. Dahda*, 853 F.3d 1101, 1117 (10th Cir. 2017), *aff'd*, 138 S.

24

Ct. 1491 (2018) (quotations omitted). Both of the prosecutor's improper statements occurred during closing argument immediately after the instructions were given to the jury. Mr. Currie gives no reason to believe the jury did not follow the court's instructions.

c. *The prosecutor's statements in summation*

Although the prosecutor incorrectly articulated the law in Comments 1 and 2, she properly stated the law at other points in her closing argument. For example, she explained, "The intent that the government has to show is that [Mr. Currie] acted with malice. In other words, that he acted on purpose with the purposeful intent to kill Katie Blanchard that day, to murder her, and not because of an accident or a heat of passion." Supp. ROA, Vol. I at 5. Moreover, she said the court's instructions provided the definitive statement of the law by directing the jury to "keep in mind what the judge's instructions tell you." Supp. ROA, Vol. I at 49. Thus, even if the jury saw a conflict in the prosecutor's heat of passion explanations, the prosecutor made clear the judge's instructions would govern.

## III. **CONCLUSION**

The prosecutor's improper statements during closing argument did not render Mr. Currie's trial fundamentally unfair and did not affect the jury's verdict. The rest of her comments were not improper. We affirm.

25