**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 27, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

THOMAS EDWARD PETRO,

    Defendant - Appellant.

No. 25-5028

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:24-CR-00137-GKF-1)**
_____

Jon W. Grevillius, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Leena Alam, Assistant United States Attorney, Northern District of Oklahoma (Clinton J. Johnson, United States Attorney, Northern District of Oklahoma, with her on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **KELLY**, and **FEDERICO**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

In November 2024, a jury found Defendant-Appellant Thomas Edward Petro guilty of one count of coercion or enticement of a minor, 18 U.S.C. § 2422(b). On appeal, he maintains the government made improper remarks during closing

argument about his presumption of innocence that amounted to reversible error. Exercising jurisdiction under 28 U.S.C. § 1291, we remand with instructions to vacate the judgment for further proceedings.

## Background

In August 2023, Mr. Petro began using Whisper, III R. 248–50, an anonymous social media application that assigned users a username but did not allow them to upload their own photos, instead permitting them to share stock photos, id. at 78–80. Users interacted with each other by sharing those photos, allowing others to comment and contact the poster. Id. at 80. Mr. Petro believed Whisper required users to be at least 18 but did not verify that belief. Id. at 249.

Around the same time, MV,[1] then 13, also began using Whisper. Id. at 77. MV's username did not indicate her legal name or age, and she could not, and did not, post photos or videos of herself to Whisper. Id. at 78–80. Mr. Petro, using a pseudonym, contacted her. Id. at 80–81. He told her that he was 31; she told him that she was 26. Id. at 81–82. MV testified that she sought to communicate with older men "[t]o play a pretend 'Catch a Predator.'" Id. After talking on Whisper, MV suggested moving their conversation to text messages, which they did. Id. at 84. Between August 10 and August 28, Mr. Petro and MV communicated regularly, sending scores of text messages a day, exchanging audio and video messages, speaking on the phone almost every night, and chatting over video. Id. at 95–96,

---

[1] The parties refer to the victim using different abbreviations. Aplt. Br. at 1; Aplee. Br. at 2 & n.1. We use the government's term, "MV."

2

255, 265.  Many of those communications were explicit.  E.g., id. at 265.  On August 29, MV's classmates found out about their communications and alerted school officials; the next day, law enforcement obtained MV's phone.  Id. at 154, 175.

In May 2024, a federal grand jury indicted Mr. Petro on one count of "knowingly persuad[ing], induc[ing], entic[ing], or coerc[ing]" a minor "to engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempt[ing] to do so[.]"  18 U.S.C. § 2422(b); I R. 10.  Mr. Petro proceeded to trial, which lasted three days.  I R. 382.  The government called four witnesses, including MV and her mother; the defense called only Mr. Petro.  Id. at 388–89.  At trial, Mr. Petro did not contest that he sent and received explicit communications to and from MV.[2]  Aplt. Br. at 5; III R. 253–54, 263, 265–66.  Instead, he claimed that he thought MV was an adult.  Aplt. Br. at 5–6; III R. 254–55.  Key to both the government's case and Mr. Petro's defense were the testimonies of MV and Mr. Petro and their text messages, which we discuss below.

At the end of the government's initial closing argument, the prosecutor stated:

The defendant began this trial cloaked with the presumption of innocence. Our job was to remove that cloak and I submit to you we have done so.  With every text message, in every digital recording, and every image we have met our burden.

III R. 298.  The government then presented a full-body image of Mr. Petro naked in the shower that he sent to MV.  Id. at 200, 298.  The prosecutor proceeded:

---

[2] Mr. Petro and the government also stipulated to the interstate commerce element of the charge.  III R. 241–43.

3

> Now, that you have heard all the evidence, I submit to you that we have
> successfully proven our case and removed that protective cloak entirely. The
> cloak has fallen to his feet and Thomas Edward Petro now stands before you
> naked in his guilt.

Id. at 298. Jury deliberations lasted for less than 40 minutes, with the jury returning

a guilty verdict 26 minutes after selecting a foreperson. I R. 382–83; II R. 46–47.

The court sentenced Mr. Petro to 140 months in prison. I R. 450.


**Discussion**

Mr. Petro contends that the above remarks during closing argument amounted

to prosecutorial misconduct because they infringed upon his constitutional right to a

presumption of innocence. He did not object to the statements at trial, so we review

them for plain error. United States v. Starks, 34 F.4th 1142, 1156 (10th Cir. 2022).

Thus, Mr. Petro bears the burden of showing that there was (1) an error (2) that was

clear or obvious (3) that affected his substantial rights and (4) that seriously affected

the fairness, integrity or public reputation of judicial proceedings. Id. at 1157.

Because Mr. Petro raises a constitutional error, "we apply the plain error rule less

rigidly[.]" United States v. Woodmore, 135 F.4th 861, 873 (10th Cir. 2025) (citation

modified).

The presumption of innocence "is one of those basic rights whose violation

may provide a ground for vacation of a . . . conviction[.]" Starks, 34 F.4th at 1158

(citation modified). "The presumption serves as a reminder to the jury that the

prosecution has the burden of proving every element of the offense beyond a

reasonable doubt, and is thus a bedrock of our criminal justice system." Id. Accordingly, misstatements of law about the presumption of innocence by the prosecutor can result in reversible error. See United States v. Christy, 916 F.3d 814, 824–25 (10th Cir. 2019); Mahorney v. Wallman, 917 F.2d 469, 473 (10th Cir. 1990).

We addressed the propriety and prejudicial effects of similar comments in two on-point decisions, Mahorney v. Wallman, 917 F.2d 469 (10th Cir. 1990) (per curiam), and United States v. Starks, 34 F.4th 1142 (10th Cir. 2022) (Holmes, C.J.), that guide our analysis here. In Mahorney, the defendant appealed from the district court's denial of his habeas petition seeking review of his rape conviction. 917 F.2d at 470. During voir dire, and again in closing argument, the prosecutor made improper remarks about having removed the presumption of innocence. Id. at 471. Conducting a harmless error review for constitutional error, we found the statements improper and that they prejudiced the defendant, requiring reversal. Id. at 474. In Starks, the prosecutor made closing remarks like those at issue here. 34 F.4th at 1158. Conducting plain-error review, we reversed on cumulative error and did not determine whether the improper remarks alone justified reversal. Id. at 1169. However, we noted that the improper remarks "had a strong potential for prejudice and did in fact have some prejudicial effects." Id.

With these cases in mind, we turn to Mr. Petro's appeal. The government concedes the first two elements of plain error review, so we need only determine whether Mr. Petro has established the third and fourth elements. Aplee. Br. at 12–13. We conclude he has.

5

**A. Mr. Petro's Substantial Rights.**

To show that the error affected his substantial rights, Mr. Petro must show "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." Starks, 34 F.4th at 1157 (citation modified). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." Id. (citation modified). When assessing the prejudicial effects of improper remarks, "we must view [them] in the context of the entire trial[,]" considering "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case." Id. at 1158 (citation modified); Mahorney, 917 F.2d at 474.

Mr. Petro argues that the improper statements affected his substantial rights because of their context and timing, the competing evidence of Mr. Petro's guilt, and the lack of curative acts by the district court. Aplt. Br. at 12–21. The government argues that the error's effect was minimal, that the evidence against Mr. Petro was overwhelming, and that the jury instructions and parties' descriptions of the burden of proof minimized any prejudice. Aplee. Br. at 13–25. Mr. Petro has the better of the argument.

**1. The Nature, Context, and Timing of the Improper Remarks.**

Mr. Petro first argues that the timing of the improper remarks weighs in favor of a finding of prejudice because the government's claim that "the presumption of innocence no longer applied" was "[o]ne of the last things the jurors heard[.]" Aplt. Br. at 13. He also asserts that the nude photo of Mr. Petro presented to the jury exacerbated the remarks' prejudicial effect. Id. at 13–14. The government argues

6

that any prejudice was minimal because the remarks were only a "small portion" of its closing argument, and because the photo was properly admitted. Aplee. Br. at 14–15 (citation modified).

We begin with the content of the remarks themselves. While the government may comment on the strength of the evidence and argue that it has proven guilt beyond a reasonable doubt, see, e.g., United States v. Rogers, 556 F.3d 1130, 1143–44 (10th Cir. 2009), it cannot tell the jury that the "presumption [of innocence] ha[s] been eliminated from the case prior to deliberations[,]" Starks, 34 F.4th at 1159 (quoting Mahorney, 917 F.2d at 473). That is because the presumption remains with the defendant throughout trial and "is extinguished only upon the jury's determination" that the government has proven the defendant's guilt beyond a reasonable doubt. Starks, 34 F.4th 1159 (first emphasis added) (quoting Mahorney, 917 F.2d at 471 n.2). Here, the government told the jurors that their job had already been completed before they began deliberating.

The timing of the remarks is also concerning. The prosecutor made the remarks at the end of the government's initial closing argument. In Starks, we held that similar statements made during closing argument had prejudicial effects because "one of the last things the jury heard before retiring to deliberate was the government's uncorrected and erroneous statement that [the defendant] no longer had a right to be presumed innocent. One might reasonably have concerns that the timing of this advisement, standing alone, could magnify its prejudicial effect." 34 F.4th at 1165 (emphasis added). Therefore, we are unconvinced by the government's

7

contention that the improper remarks were brief or of minimal importance to its closing argument.

The use of the naked photo of Mr. Petro compounds these prejudicial effects. We see no other purpose for the use of the photo in this manner other than to provide a "visual analogy" of the government's improper remarks about Mr. Petro being "naked" because the evidence had removed the "cloak" of the presumption of innocence. Aplt. Br. at 13–14. That the photo was properly admitted is irrelevant — the government cannot use properly admitted evidence to bolster an obviously improper argument that undermines a defendant's core constitutional right and conflicts with the court's instructions.

The government attempts to distinguish this case from Starks by noting that our decision to reverse there was not based solely on the prejudicial effect of the improper remarks, but rather in conjunction with other errors. Aplee. Br. at 15–16. While we reversed in Starks for cumulative error, we engaged in extensive analysis of the prejudicial effects of the remarks, assessing various factors, including their context and timing, before concluding that they "had a strong potential for prejudice and did in fact have some prejudicial effects." Starks, 34 F.4th at 1169. Therefore, Starks strongly suggests that improper remarks alone can be sufficient to affect a defendant's substantial rights, and we are not persuaded by the government's attempts to distinguish it from the case at bar.

Accordingly, we find that the nature, context, and timing of the remarks weigh in favor of a finding of prejudice.

8

**2. The Strength of the Evidence Against Mr. Petro.**

Next, Mr. Petro contends that the evidence presented by the government was not overwhelming, further weighing in his favor. We considered this factor when assessing prejudice in both Mahorney and Starks.

In Mahorney, the defendant, faced with a rape charge, did not contest that intercourse occurred, instead raising a consent defense. 917 F.2d at 470, 474. At trial, the parties "presented . . . two relatively credible, competing stories related by the complaining witness and the accused, neither of which was conclusively confirmed or disproportionately discredited by extrinsic evidence." Id. at 474. We concluded that the lack of strength of the government's case weighed in favor of a finding of prejudice. Id.

We reached a similar conclusion in Starks. There, the defendant was driving a vehicle traveling closely to a second vehicle when both were stopped; drugs were found in the second vehicle. 34 F.4th at 1148–49. At trial, the main issue before the jury was whether the defendant knew there were drugs in the second vehicle. Id. at 1167. But the government's case "turned on circumstantial evidence[,]" including inculpatory testimony from a witness with questionable credibility. Id. at 1167–69. Noting that the government's failure to produce any direct evidence of the defendant's knowledge weakened its case, we concluded that it lacked "overwhelming" evidence of the defendant's guilt, resulting in "strong potential for prejudice [] and actual prejudicial effects[.] Id. at 1166–67, 1169.

We turn to the instant appeal.  At trial, MV testified that she told Mr. Petro that she was 13 "a few hours" after he contacted her on Whisper.  III R. 82–83.  However, the government never obtained or produced any messages from Whisper.  Id. at 227–28.  Instead, it introduced hundreds of text messages between MV and Mr. Petro, contending that these messages corroborated MV's testimony that Mr. Petro knew MV was 13 from the outset.  See generally I Aplee. Supp. App.; II Aplee. Supp. App.

Mr. Petro testified that he believed MV was an adult.  He claimed that, at MV's request, the two engaged in "age-play," i.e., "[p]retending to be an age that she was not[,]" which MV seemingly admitted.  III R. 160, 252.  Mr. Petro further claimed that MV told him that she was actually 18 years old, which is what he believed for most of their time conversing.  Id. at 253.  He testified that the conversations about age-play and MV being 18 happened on Whisper, so there were no records corroborating his claims.  Id. at 251–53.  He also testified that they spoke over the phone and discussed topics indicating she was an adult.  Id. at 256.  According to Mr. Petro, MV only told him she was 13 over the phone around August 26 or 27.  Id. at 261–62.  He claimed that he was unsure if she was telling the truth and that he was worried that he might be in trouble, so he tried over the next few days to "quietly walk away[.]"  Id. at 262.

Having reviewed the testimonies of MV and Mr. Petro and the text messages, we disagree with the government that it is "virtually impossible" for the text messages to be read in a way other than conclusively supporting Mr. Petro's guilt.

10

Oral Arg. at 21:24–21:48.  To the contrary, we find that most of the text messages could support both the government's and Mr. Petro's claims.  While some texts did indicate MV was in school and had chores, such texts would be consistent with an 18-year-old who was still in high school.  Even a message in which MV stated that it was her "last day being 13" and Mr. Petro's subsequent messages expressing concern that others could find out about their relationship could be read in the context of age-play, or as Mr. Petro being concerned about others discovering their "relationship" because MV was 18 but still in high school.  II Aplee. Supp. App. 42, 66, 89–91.

In claiming that the evidence was overwhelming, the government relies upon texts from August 29.[3]  Aplee. Br. at 23–24; Aplee. R. 28(j) Letter at 1–2.  Specifically, Mr. Petro texted MV that he could "use a pick me up before bed[.]"  II Aplee. Supp. App. 172.  And in response to sexually explicit texts sent by MV, Mr. Petro sent her a sexually explicit text.  Id. at 172–73.  Recall that at this point, Mr. Petro claimed that MV had told him she was 13.  III R. 262, 269–70.

Here, the government had to prove that Mr. Petro "knowingly persuade[d], induce[d], entice[d], or coerce[d]" MV "to engage in . . . sexual activity for which any person can be charged with a criminal offense, or attempt[ed] to do so[.]"  18

---

[3] These texts were time-stamped as being sent around 1:00 a.m. UTC time on August 29.  II Aplee. Supp. App. 167–73.  UTC time is five hours ahead of Central Time, where MV was located.  III R. 195–96.  To be consistent with the time stamps, we refer to the date on which these texts were sent as August 29.

U.S.C. § 2422(b).  At trial, the court instructed the jury on four underlying offenses.[4]  I R. 406–07.  One of those offenses was Oklahoma Statute title 21, § 1040.13a(A), which makes it a crime "to facilitate, encourage, offer or solicit sexual conduct with a minor, or other individual the person believes to be a minor, by use of any technology, or to engage in any communication for sexual or prurient interest with any minor, or other individual the person believes to be a minor[.]"  Okla. Stat. tit. 21, § 1040.13a(A).

The government asserts the August 29 texts provide "sufficient" and "ample evidence to find [Mr.] Petro guilty of enticing MV to engage in sexual communications violating" § 1040.13a(A) because they demonstrate that Mr. Petro continued to entice MV even after he learned she was a minor.  Aplee. Br. at 23–24; Aplee. R. 28(j) Letter at 1–2.  These texts could be sufficient to support a conviction under § 1040.13a(A).  But sufficient evidence is not enough to find no prejudice — instead, the evidence must be overwhelming.  See Starks, 34 F.4th at 1169; Mahorney, 917 F.2d at 474.  We do not think it is so.

Mr. Petro did not send or receive any explicit photos after August 26 or 27. Instead, he testified that he was attempting to "walk away" from the conversation, supporting an inference that he did not intend to send or receive any sexually explicit messages to or from MV.  III R. 262.  And although MV had purportedly told him

---

[4] Three of those offenses require intent to produce or procure visual depictions of sexually explicit conduct involving a minor.  18 U.S.C. §§ 2251–52; Okla. Stat. tit. 21, §§ 1021.2, 1024.1(A).

12

that she was 13 already, Mr. Petro hardly "admitted" that he knew she was 13 at this point, as the government claims. Aplee. Br. at 23–24. Rather, he testified that he was concerned that he might be getting scammed or extorted and ultimately "did[] [not] know what to think." III R. at 262, 269. The fact that MV had, by Mr. Petro's account, already lied about her age twice underscores his equivocal testimony as to his knowledge of MV's age. These points, together with the fact that MV seemingly initiated the sexually explicit comments at issue, leave us unpersuaded that the August 29 messages were overwhelming evidence that Mr. Petro was guilty of enticing MV to violate § 1040.13a(A). To the contrary, we think that a reasonable juror could conclude, based on Mr. Petro's testimony, that he did not entice or attempt to entice her to do so.

The government also argues that, unlike in Starks, where the jury had difficulty reaching a verdict, the jury here took less than 30 minutes to do so, indicating the strength of the government's case. II R. 46–47; Aplee. Br. at 25 (citing Starks, 34 F.4th at 1168). But the length of jury deliberations was not dispositive in Starks. 34 F.4th at 1168. In any event, we find that the length of deliberations here could suggest that the verdict was not just quick but actually hasty, supporting Mr. Petro's claim of prejudice. Oral Arg. at 11:01–11:48. We find it hard to believe that the jury was able to read all instructions as charged by the court, I R. 414, carefully weigh all the evidence presented at trial, and deliberate, all in under 30 minutes.

Ultimately, which story the text messages support depends on whether one believes MV's testimony that she told him immediately that she was 13 or Mr.

13

Petro's testimony that she told him that she was 18, that they had agreed to engage in roleplay, and that he did not believe that she was 13 even after she told him so over the phone. And a reasonable juror could believe either MV or Mr. Petro. So, as in both Starks and Mahorney, the issue of Mr. Petro's guilt turned primarily on credibility assessments of competing witnesses. See Mahorney, 917 F.2d at 474; Starks, 34 F.4th at 1166–67, 1169. And here, the improper remarks not only impugned Mr. Petro's presumption of innocence but also undermined his credibility, magnifying the remarks' prejudicial effects because Mr. Petro's credibility was critical to the jury's determination of guilt.[5] In short, while the evidence against Mr. Petro may have been sufficient to sustain a conviction, it did not amount to a "smoking gun" requiring affirmance. Starks, 34 F.4th at 1167.

Based on the foregoing, we conclude that the evidence against Mr. Petro was not overwhelming, and that this factor weighs in favor of a finding of prejudice.

---

[5] At oral argument, the government asserted that improper remarks like those at issue here cannot undermine the defendant's credibility because we only discussed credibility in Mahorney and Starks when assessing the weight of the entirety of the evidence against the defendants and not whether remarks on the presumption of innocence could impugn the defendant's credibility. Oral Arg. at 18:21–20:21. We do not find these arguments convincing. Here, the credibility of the defendant, Mr. Petro, is a key issue. And it strains credulity to conclude that the prosecutor's remarks about removing Mr. Petro's presumption of innocence would not also undermine his credibility. Cf. United States v. Dwyer, 843 F.2d 60, 64 (1st Cir. 1988) (noting that the court could not properly instruct the jury on the presumption of innocence while also "indicat[ing] doubts about the defendant's credibility").

### 3. The Jury Instructions and Subsequent Statements by Counsel.

Finally, Mr. Petro argues that the court's jury instructions failed to lessen the prejudice of the improper remarks. Aplt. Br. at 18–21. He points to the fact that the instructions were too "general[] and minimal" to reduce the prejudicial effect of the remarks, and to the fact that the court did not orally instruct jurors on the presumption of innocence at the close of evidence, doing so only at the beginning of trial. Id. at 18. The government argues that the jury "was repeatedly reminded of the burden of proof and [Mr.] Petro's presumption of innocence" by both the court and counsel, mitigating any prejudice. Aplee. Br. at 16–20. Again, we agree with Mr. Petro.

In Mahorney, we held that the district court's failure to admonish the jury or give it curative instructions, together with its generalized and "not sufficiently specific" instructions on the presumption of innocence and burden of proof, weighed in favor of a finding of prejudice. 917 F.2d at 473–74. In Starks, the district court also gave "only generalized instructions" on the burden of proof and the presumption of innocence, which were "unhelpful in mitigating" the improper remarks' "strong potential for prejudice . . . and actual prejudicial effects[.]" 34 F.4th at 1160–61. The court also orally instructed the jury only at the beginning of trial. Id. at 1162–63. We concluded that this "unconventional timing . . . may have undermined any capacity (albeit limited) that the court's generalized instructions may have had to mitigate" the remarks' potential and actual prejudice. Id. at 1162–64.

15

Here, as in both Mahorney and Starks, the court only provided generalized instructions on the presumption of innocence and the burden of proof. I R. 391–94, 398, 401, 404–05, 409, 414. And there were no curative instructions given to the jury after the improper remarks, which "could have left the jury with the impression that the court condoned the prosecution's impermissible statements." Starks, 34 F.4th at 1161.

Further, the timing of the oral delivery of the generalized instructions "undermined any capacity" that they may have had in minimizing prejudice. Id. at 1164. The court read the presumption-of-innocence instruction at the start of trial. III R. 42. But contrary to the government's claims, Aplee. Br. at 17, 19, the court did not orally instruct the jury on the presumption of innocence again. Instead, it only referenced that instruction by number before closing arguments, electing not to read it again. III R. 287. And although the record indicates the court orally instructed the jury on the burden of proof at this point, id., an instruction on the burden of proof cannot cure the failure to properly instruct on the presumption of innocence, Taylor v. Kentucky, 436 U.S. 478, 484–85, 488 (1978). Nor did the court's provision of written copies of the instructions to the jury mitigate any prejudice, id. at 286, as written instructions "cannot replicate" the role that oral instructions play "in ensuring that jurors gain an accurate and comprehensive understanding of a case's governing legal principles[,]" Starks, 34 F.4th at 1166. Here, the jury only heard instructions on the presumption of innocence "approximately two days before they began deliberations" and did not hear them again. Id. at 1163. Therefore, the generalized

16

nature of the instructions, together with the timing of their oral delivery, weigh in favor of a finding of prejudice.  Id. at 1161–62.

The government asserts that any prejudice was minimized because of subsequent statements made by the prosecution and defense counsel.  Aplee. Br. at 17–18.  It specifically notes that defense counsel told the jury that the government bore the burden of proof, underscored the importance of the jury instructions and the jury's obligation to follow them, and specifically referenced Instruction No. 5, which discussed the burden of proof but not the presumption of innocence.  Aplee. Br. at 17–18, III R. 305–07.  It also points to correct statements regarding the burden of proof made by the government during its rebuttal.  Aplee. Br. at 18; III R. 314–15.  For support, it cites United States v. Currie, 911 F.3d 1047 (10th Cir. 2018).  There, we held that the prosecutor's misstatements about the burden of proof during closing argument did not prejudice the defendant because the prosecutor subsequently stated the law correctly and later cited to the court's instructions that correctly stated the law.  911 F.3d at 1061–62.

But Currie is inapposite here for three reasons.  First, "arguments of counsel cannot substitute for instructions by the court."  Taylor, 436 U.S. at 488–89.  Second, as we have already stated, an instruction on the burden of proof cannot cure the failure to properly instruct on the presumption of innocence, see id. at 484–85, 488; Starks, 34 F.4th at 1161 n.5, so defense counsel's statements about the burden of proof and her reference to Instruction No. 5 did not have any ameliorative effect.  And third, the Currie court relied on other factors, including on the "overwhelming

17

evidence" against the defendant and on the fact that the misstatements were made just after the court instructed the jury, to find there was no prejudice. 911 F.3d at 1060–61. But the evidence against Mr. Petro was not overwhelming. And the court orally instructed the jury on the presumption of innocence two days before it heard the improper remarks. Therefore, the statements cited by the government did not lessen the prejudicial effects of the remarks.

Based on the foregoing, and when considering the error in the context of the entire trial, including (1) the nature, context, and timing of the improper remarks and the use of the photo, (2) the lack of overwhelming evidence against Mr. Petro, and (3) the lack of curative or ameliorative jury instructions, the generalized nature of the instructions, and the timing of the oral delivery of those instructions, we conclude that he has shown that the remarks affected his substantial rights.

## B. The Fairness and Integrity of Judicial Proceedings.

Mr. Petro also bears the burden of establishing the fourth element of plain-error review. Because there is a constitutional error here, we apply a "relaxed standard," meaning Mr. Petro need not meet the "exceptional showing" ordinarily required to reverse and remand a case of non-constitutional error. Starks, 34 F.4th at 1157 (citation modified). "This is so because a reversal usually directly cures the constitutional infirmity and, as a result, the failure to notice and correct the constitutional error would impugn the fairness, integrity, or public reputation of judicial proceedings." United States v. Mozee, 405 F.3d 1082, 1091 (10th Cir. 2005). Still, Mr. Petro must "show that an exercise of our discretion is appropriate."

18

Starks, 34 F.4th at 1157 (citation modified).  Our analysis is "case-specific and fact-intensive[.]"  Id. (citation modified).

He argues that reversal is warranted because there are "[n]o countervailing factors support[ing] affirmance[,]" pointing to the lack of overwhelming evidence and the fact that the case turned on competing credibility determinations.  Aplt. Br. at 21–22.

As we stated in Starks, "it is difficult to overstate the importance of the presumption of innocence to the fairness and integrity of our criminal justice system."  34 F.4th at 1175.  The presumption of innocence "is especially important" in cases like this one where "the evidence was . . . not overwhelming."  Id.  Here, the "jury was told that this presumption evaporated at the close of the evidence — before it began deliberating on [Mr. Petro's] guilt and innocence."  Id.  The government reminds us that Starks is distinguishable because there we only reversed for cumulative error.  Aplee. Br. at 26–27.  But our primary focus when assessing the fourth element of plain-error review in Starks was on the improper remarks.  34 F.4th at 1175–76.  Given the egregiousness of the remarks and their prejudicial effect on a critical constitutional right, we exercise our discretion to conclude that Mr. Petro has shown that the remarks seriously affected the fairness, integrity, or public reputation of judicial proceedings.  Id. at 1175.  Therefore, his "conviction[] cannot stand."  Id. at 1176.

Before concluding, we make one additional point on the timing of delivering jury instructions.  Rule 30(c) permits the court to instruct the jury either before or

after closing arguments, or at both times, Fed. R. Crim. P. 30(c), and we have declined to read Rule 30(c) to require courts to orally instruct the jury at the close of evidence, United States v. Capps, 112 F.4th 887, 896–99 (10th Cir. 2024).  Our holding today does not say otherwise.  But we take this opportunity to encourage courts to orally instruct the jury at the close of evidence, even if they have done so at the start of trial.  This case demonstrates precisely why such a procedure is preferred — because neither the trial court nor trial counsel can predict what may or may not happen during the course of trial or the arguments made on appeal.

The rules of evidence and proper argument ensure cases are decided on the merits, with reliable, admissible evidence.  Inadmissible or prejudicial evidence or remarks may sway the jury and undermine the truth-seeking function of a trial.  Given that judges are generally reluctant to intervene sua sponte, they rely on counsel to object.  Failure to do so not only undermines the integrity of the trial, as it did here, but also requires courts of review, like ours, to engage in plain error review.  That is problematic because this standard is a difficult one to meet, and errors that may have prejudiced a defendant often will not be remediated.

For the foregoing reasons, we **REMAND** to the district court with instructions to **VACATE** Mr. Petro's conviction and conduct further proceedings consistent with this opinion.