**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MARK JORDAN,

    Defendant - Appellant.

No. 15-1046

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:04-CR-00229-LTB-1)**
_____

Sean Connelly, Reilly Pozner, LLP (Dru Nielsen and Michael Kotlarczyk, Reilly Pozner LLP; and Laura Rovner, University of Denver Sturm College of Law, with him on the briefs), Denver, Colorado, appearing for Defendant-Appellant.

J. Bishop Grewell, Assistant United States Attorney (John F. Walsh, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Colorado, Denver, Colorado, appearing for Plaintiff-Appellee.
_____

Before **LUCERO**, **HOLMES**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

On June 3, 1999, inmate David Stone died after he was stabbed three times with a shank—a makeshift knife—while located in the recreation yard at the United States Penitentiary in Florence, Colorado ("USP Florence"). A federal grand jury

indicted inmate Mark Jordan for the murder of Mr. Stone and three related assaults. In 2005, a jury found him guilty on all counts.

In 2012, Sean Riker, another inmate who was present in the prison recreation yard on June 3, 1999, confessed to stabbing Mr. Stone and agreed to provide Mr. Jordan's counsel a DNA sample. Mr. Jordan's DNA expert then linked Mr. Riker's DNA to DNA found on the murder weapon. Based on Mr. Riker's confession and the new DNA analysis, Mr. Jordan moved for a new trial under Federal Rule of Criminal Procedure 33 due to newly discovered evidence.

The same district court judge who had presided over the trial held a Rule 33 evidentiary hearing. The defense first presented its newly discovered evidence, calling Mr. Riker and its DNA expert to testify. The Government then called six witnesses, none of whom testified at trial. The first four testified about Mr. Stone's alleged dying declarations, which identified Mr. Jordan as the killer. A fifth witness testified he saw Mr. Jordan stab Mr. Stone. A sixth witness testified he heard Mr. Jordan make incriminating statements before the stabbing. In rebuttal, the defense offered the testimony of one Bureau of Prisons ("BOP") official and Mr. Jordan himself. After the conclusion of the Rule 33 hearing, the district court denied Mr. Jordan's motion for a new trial.

Mr. Jordan appeals on two grounds. First, he argues the district court should not have admitted and considered new government evidence. He argues that Rule 33 permits consideration only of (1) evidence admitted at trial and (2) newly discovered evidence offered by the defendant. Based on these two types of evidence alone, he

contends that he satisfied his burden under Rule 33 to warrant a new trial. Second, he argues that, even if Rule 33 permits new government evidence, the Federal Rules of Evidence and the Confrontation Clause each should have barred admission of Mr. Stone's dying declarations.

Exercising jurisdiction under 18 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### *A. Trial and Conviction*

The following undisputed facts are taken from our opinion affirming Mr. Jordan's convictions and sentence on direct appeal:

> Mark Jordan was accused of murdering a fellow prisoner at the United States Penitentiary in Florence, Colorado. The crime occurred on the afternoon of June 3, 1999 in the maximum-security prison's recreational yard.
>
> The victim, inmate David Stone, sat at a picnic table in the prison yard wearing only shorts and tennis shoes. Numerous other prisoners were exercising, congregating, and playing games in the outdoor sun. Near Stone were three other inmates, including Mark Jordan and Sean Riker. Both Jordan and Riker were observed walking away from the table. Minutes later, someone stabbed Stone three times. Two of the wounds were superficial, while the third was fatal. Stone was able to run across the yard before collapsing. Later that night he died.
>
> Two inmates saw the stabbing. Gary Collins was in the recreational yard at the time of the stabbing. He observed Jordan, oddly dressed considering the heat in a khaki shirt and pants, in the vicinity of Stone. Collins saw Jordan walk behind Stone and stab him in the back. Collins described Jordan's action as "swinging a bat" in Stone's lower back. After Collins watched Jordan make other stabbing motions, Stone "[t]ook off running." He also witnessed Jordan start running after Stone, but Stone was far ahead.
>
> Another inmate, Tyrone Davis, was also in the yard and observed the stabbing. He saw Jordan standing by Stone, then watched as Jordan pushed or punched Stone in the back side in an underhanded manner. According to

Davis, Stone then started running and Jordan gave chase. He then saw Stone on the ground near a crowd of people, but lost sight of Jordan.

Overlooking the recreational yard is the lieutenant's patio. There, Norvel Meadors, an assistant warden at the prison was taking a cigarette break. While he was smoking, he saw "two inmates sprinting across the yard out on the sidewalk." From his vantage point, Meadors could not identify the inmates, but he noticed one was wearing only shorts and no shirt and the other was in the standard prison attire of a khaki shirt and pants. Meadors immediately recognized that the two inmates were involved in a chase, with the shirtless inmate ahead of the fully clothed one. Over the radio, he ordered a compound officer to direct the inmates to cease their action.

Meadors then observed the pursuing inmate stop, while the other one continued running and eventually collapsed to the ground. Meadors saw the inmate in the khaki shirt and pants throw "an object" on top of a housing unit and then sit down at a picnic table. Meadors watched as a compound officer approached this inmate at the picnic table, patted him down, and then took him into custody.

The officer who responded to Meadors's radio call was Benjamin Valle. After Meadors's call, he observed two inmates running, with one about fifteen yards behind the other. Valle watched the trailing inmate stop and then start walking back to a housing unit, throw something up on the roof of the housing unit, and walk over to a bench table and sit down. Valle searched the inmate and then escorted him off the yard. That inmate was Mark Jordan.

Another corrections officer, Fares Finn, Jr., observed the same incidents in nearly identical detail to Valle. A video surveillance camera also captured some of the events that afternoon, among other things (1) four inmates, including Jordan and Stone, sitting at a concrete bench approximately eleven minutes before the stabbing, (2) Jordan approaching where Stone sat immediately before the stabbing, and (3) the subsequent chase between Stone and Jordan. Because of the camera angle, it did not capture the fatal encounter.

After the stabbing, a prison official noticed a spot of blood on Jordan's left arm. Asked about the blood, Jordan claimed it originated from when "[t]hat guy [Stone] ran into me, that's how I got blood on me. I was trying to help him." Later, authorities recovered a bloody, homemade knife or shank about eleven or twelve inches long from the roof of the housing unit. DNA from the shank was determined to belong to Stone. Additional DNA

evidence was found on the handle of the knife, but its origin could not be determined. No fingerprints were found on the knife because its handle had been wrapped in cloth.

. . . .

Five years after the stabbing, Jordan was charged with the murder of Stone and three related offenses. Count One alleged second degree murder, in violation of 18 U.S.C. § 111(a). Count Two charged assault with intent to commit murder, in violation of 18 U.S.C. § 113(a)(1). Count Three accused Jordan of assault with a dangerous weapon, in violation of 18 U.S.C. § 113(a)(1). Count Four asserted assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6). On August 9, 2005, a jury found Jordan guilty of all four counts.

. . . .

At trial, Jordan did not dispute that (1) he handled the shank that caused the fatal stab wounds to Stone, (2) he was the man Meadors and Valle saw running across the yard, and (3) he threw the murder weapon on the roof. Jordan contended that he did not kill Stone, who had been his cellmate for two months at the United States Penitentiary in Atlanta. Instead, he claimed Sean Riker, who was also at the scene of the stabbing, was the actual assailant.

*United States v. Jordan*, 485 F.3d 1214, 1216-17, 1219-20 (10th Cir. 2007) (internal record citations and footnote omitted).[1]

---

[1] Our opinion additionally noted the following facts in two footnotes:

While receiving medical attention in the prison medical facility, Jordan was observed making the "V" sign with his hands to another inmate and saying, "Guy, I get him out of your way."

The prosecution presented evidence that Jordan accumulated several debts owing to other prisoners. The prosecution's theory was that Jordan wanted to get out from under the debts by being placed in a segregated cell or being transferred to another prison. Jordan's case manager testified that Jordan told him that he wanted "to get off this mountain," and stated that he would have to "hurt someone" to get into another institution. The prosecution also

Continued . . .

- 5 -

## B. *Appeals and Post-Conviction Motions*

We affirmed Mr. Jordan's conviction and sentence on direct appeal. *Id.* at 1216.

He then filed a motion for additional DNA testing under the Innocence Protection Act of

2005 ("IPA"), 18 U.S.C. § 3600, and a related motion to require the Government to

preserve his trial evidence. The district court denied the first motion and dismissed the

second as moot. We affirmed its decision as to both. *See United States v. Jordan*, 594

F.3d 1265, 1266 (10th Cir. 2010). Mr. Jordan also moved for relief under 28 U.S.C.

§ 2255 based in part on ineffective assistance of counsel and the results he anticipated

from additional DNA testing. The district court denied that motion, *United States v.*

*Jordan*, No. 04-cr-00229-LTB, at 123-24 (D. Colo. Jan. 21, 2011) (unpublished), ECF

No. 639, and we denied a certificate of appealability for Mr. Jordan to appeal that denial,

*United States v. Jordan*, 461 F. App'x 771, 773 (10th Cir. 2012) (unpublished).[2]

After obtaining Mr. Riker's confession and the new DNA analysis, Mr. Jordan

moved for a new trial under Rule 33 based on newly discovered evidence. He also

moved for authorization to file a second or successive § 2255 motion, which we granted.

*See In re Mark Jordan*, No. 13-1436, at 1 (10th Cir. Nov. 14, 2013) (unpublished).

---

introduced into the record a letter Jordan wrote to his mother discussing his desire to be placed in segregation.

*Id.* at 1223 nn.5-6 (internal record citations omitted).

[2] Mr. Jordan filed numerous other post-conviction motions. We have limited our background section to those most relevant to this appeal.

Although he filed his § 2255 motion, he elected to dismiss it and rely solely on his Rule 33 motion for relief.

## C. *Rule 33 Hearing*

The parties presented the following evidence at the Rule 33 hearing.

1. **Mr. Jordan's Newly Discovered Evidence**

Mr. Jordan introduced the new DNA analysis and Mr. Riker's statements.

a. *New DNA Evidence*

Mr. Jordan called Dr. Roger Vincent Miller, a DNA expert, to testify during the Rule 33 hearing. Consistent with other DNA experts who had testified at the trial, Dr. Miller testified that the DNA on the shank came from more than one person and the "major source" contributor was Mr. Stone. ROA, Vol. 4 at 228. The experts at trial, who had lacked a DNA sample from Mr. Riker, had been unable to identify the minor source contributor. Using the new DNA samples from Mr. Riker, Dr. Miller conducted additional analysis. He testified that, based on his analysis, Mr. Riker "could not be excluded as a contributor to the shank handle." *Id.* at 212. He further testified he "would expect to be able to exclude all but one in 2.3 million" Hispanic, Caucasian, and African-American individuals. *Id.* at 222.

b. *Mr. Riker's Letters, Declaration, and Testimony*

In April and September 2012, Mr. Riker wrote two letters to Mr. Jordan's counsel. The first letter stated Mr. Jordan was innocent. The second reversed course, asserting Mr. Jordan killed Mr. Stone. One month after sending the second letter, Mr. Riker sent a third letter to Mr. Jordan's trial prosecutor, confessing to the murder of Mr. Stone. The

letter said Mr. Riker stabbed Mr. Stone in the back and then passed the shank to Mr. Jordan.

In November 2012, Mr. Riker sent another letter to Mr. Jordan's counsel, again confessing to the crime. In yet another letter to the same attorney, he reiterated Mr. Jordan's innocence, stating, "I am trying to set him free and trade places w[ith] him. I want to go to the feds." Aplee. Suppl. App. at 26.

Mr. Riker wrote these letters while serving a sentence of over 200 years in Wisconsin state prison for abusing his ex-wife and sexually abusing her children, along with various other crimes.

In April 2013, Mr. Riker signed a sworn and notarized declaration, prepared by Mr. Jordan's attorneys and hand-edited by himself, confessing to the crime and stating the following: On the morning of the murder, Mr. Jordan asked Mr. Riker to make him a knife, explaining that an inmate had threatened to attack him. Mr. Riker responded by making him a shank. Later that day, while Mr. Stone, Mr. Riker, and Mr. Jordan were gathered together in the recreation yard, an argument began. Mr. Riker and Mr. Jordan walked away together, at which point Mr. Riker took the shank back from Mr. Jordan and stabbed Mr. Stone. During the resulting commotion, Mr. Riker "forced Jordan to take the knife and told him to run." Aplt. Suppl. App., Vol. 1 at 5, ¶ 10.

Mr. Riker subsequently wrote another letter to Mr. Jordan's counsel, revoking his confession and stating he would assert his Fifth Amendment right to remain silent if called to the stand.

On June 26, 2014, the defense called Mr. Riker to testify at the Rule 33 hearing. Mr. Riker repeatedly testified that his previous confessions were lies and that Mr. Jordan had stabbed Mr. Stone. He also testified he touched the weapon the day of the stabbing. While he was in a cell with a friend, the friend "whip[ped] out the knife and [went] to stab [him] in [his] stomach, playfully." ROA, Vol. 4 at 125. Mr. Riker "grabbed ahold of it and . . . said, 'Quit [messing] around.'" *Id.* He also stated he had lied when he confessed to the murder because he thought he would be better off a murderer in a federal prison than a child molester in a state prison. During the course of Mr. Riker's testimony, the aforementioned letters and declaration were presented to the district court.

## 2. **The Government's New Evidence**

The prosecution then called six witnesses. None had testified at trial. The first four testified about Mr. Stone's alleged dying declarations, which identified Mr. Jordan as the killer. The fifth government witness, Larry Rasnick, testified he was a USP Florence inmate on the day of the incident, was present in the recreation yard, and saw Mr. Jordan stab Mr. Stone. The sixth witness, BOP official Walter Clark, testified that, about one month before the stabbing, Mr. Jordan requested single-cell housing, and his request was denied. Mr. Clark testified that Mr. Jordan asked if he needed to kill someone to get a single cell.

## 3. **Mr. Jordan's Rebuttal**

The defense then called Mr. Jordan as a rebuttal witness. He testified as follows: Before the stabbing, Mr. Riker and Mr. Stone had argued. Mr. Jordan did not see Mr. Riker stab Mr. Stone, but, upon hearing the commotion, he turned and saw Mr. Stone

start running.  Mr. Riker handed Mr. Jordan the murder weapon and told him to go. Panicked and disoriented, Mr. Jordan started running behind Mr. Stone with the shank in hand.  Mr. Jordan then ran in a different direction and threw the shank on top of a housing unit.[3]

## D.  *The District Court's Rule 33 Ruling*

In deciding Mr. Jordan's motion for a new trial, the district court evaluated "all of the evidence that a jury would be likely to hear and consider were the defendant granted a new trial," reasoning "it would be a waste of judicial resources to grant Defendant's motion without considering evidence that will have a significant impact on whether Defendant is likely to be acquitted at a new trial."  ROA, Vol. 1 at 1915 (quotations omitted).

Beginning with the new DNA analysis, the district court found that Dr. Miller's conclusions proved nothing more than the undisputed fact from the trial evidence that Mr. Riker touched the shank.  As to Mr. Riker, the court concluded he was "simply not credible in any respect."  ROA, Vol. 1 at 3101, ¶ 13.  The court stated Mr. Riker had "serious credibility problems such that neither his statements admitting to stabbing Stone [n]or his statements denying that he did so are credible."  *Id.* at 3090, ¶ 26.

Turning to the Government's case, the district court found the witness testimony credible.  Lastly, it found that Mr. Jordan's rebuttal testimony lacked credibility, as it

---

[3] The defense also called a BOP official to impeach a government witness's testimony about Mr. Stone's dying declarations.

- 10 -

contradicted his own statements in his § 2255 motion, the eyewitness accounts, and Mr. Stone's dying declarations. The court also found his credibility was "significantly undermined by the tremendous benefit to him if his murder sentence was vacated at a new trial." *Id.* at 3097, ¶ 62.

Viewing this evidence as a whole, the district court concluded a jury would probably not acquit Mr. Jordan. It therefore denied his motion for a new trial.

## II. **DISCUSSION**

Mr. Jordan appeals on two grounds. First, he argues the district court erroneously relied on new government evidence. He contends that Rule 33 permits a court to consider only evidence admitted at trial and newly discovered evidence offered by the defendant, not new government evidence. Second, he contends that, even if Rule 33 permits consideration of new government evidence, the court should have excluded the Government's new evidence of Mr. Stone's dying declarations under Federal Rule of Evidence 804(b)(2) and the Confrontation Clause.

We affirm the district court's denial of Mr. Jordan's motion for a new trial. Mr. Jordan failed to carry his burden under Rule 33 based on adding his newly discovered evidence to the trial evidence. Any error the district court may have made in considering new government evidence was therefore harmless.[4] In resolving Mr. Jordan's appeal on

---

[4] We express no opinion on whether it is proper for a district court to consider new evidence from the prosecution when a defendant moves for a new trial under Rule 33(a) because we need not do so to decide this appeal.

this ground, we decline to address his additional argument that the dying declarations were inadmissible.

### A. Standard of Review and Rule 33(a)

We review the denial of a motion for new trial based on newly discovered evidence for an abuse of discretion, *United States v. McCullough*, 457 F.3d 1150, 1167 (10th Cir. 2006), which occurs when the district court's decision is "arbitrary, capricious, whimsical, or manifestly unreasonable." *Id.* (quotations omitted).

"Abuse-of-discretion review ordinarily includes review of any legal conclusions de novo and any factual findings for clear error." *United States v. Ray*, 704 F.3d 1307, 1315 (10th Cir. 2013); *see United States v. Hicks*, 779 F.3d 1163, 1170 (10th Cir. 2015); *United States v. Kieffer*, 681 F.3d 1143, 1164 (10th Cir. 2012). We will not disturb factual findings "unless they have no basis in the record." *United States v. Martin*, 163 F.3d 1212, 1217 (10th Cir. 1998).

"We defer to a district court's credibility determinations when reviewing a district court's findings of fact under a clearly erroneous standard." *United States v. Minjares-Alvarez*, 264 F.3d 980, 988 (10th Cir. 2001). A credibility determination commands "even greater deference to the trial court's findings" than do other findings of fact. *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985). We therefore "especially defer" to a district court's findings on "witness[] credibility." *United States v. Ortiz*, 25 F.3d 934, 935 (10th Cir. 1994); *see United States v. Clark*, 57 F.3d 973, 977 (10th Cir. 1995).

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice

so requires." A Rule 33(a) motion may be based on "newly discovered evidence." Fed. R. Crim. P. 33(b)(1). "A motion for a new trial based on newly discovered evidence is not favorably regarded and should be granted only with great caution." *McCullough*, 457 F.3d at 1167 (quotations omitted). To prevail, a defendant must prove:

> (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.* (quotations omitted). The parties dispute only whether Mr. Jordan met his burden to satisfy the final requirement.

A district court serves as a "gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered new evidence is credible." *Id.* (quotations omitted); *see also United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999) ("[A] trial court is afforded discretion in ruling on such a motion, and is free to weigh the evidence and assess witness credibility . . . ."). We afford a district court broad discretion because "its vantage point as to the determinative factor—whether newly discovered evidence would have influenced the jury—has been informed by the trial over which it presided." *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006). "[H]aving presided over the trial, it is in a better position to decide what effect the newly discovered materials might have had on the jury." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

Under Federal Rule of Criminal Procedure 52(a), "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." An error that affects substantial rights is one with a "prejudicial effect on the outcome of a judicial

proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)).

## B.   *Analysis*

We affirm the district court's denial of Mr. Jordan's motion for a new trial because he failed to meet his burden to show a jury would probably acquit him, as he must under Rule 33.  We need not decide whether the Government should not have been allowed to present new evidence in general or new dying declaration evidence in particular because Mr. Jordan's new evidence did not warrant a new trial in the first place.

### 1.  **New DNA Evidence**

We begin with Dr. Miller's DNA analysis.[5]  When Mr. Jordan first moved for new DNA testing under the IPA, he contended further analysis might reveal the shank contained Mr. Riker's DNA, which would suggest Mr. Jordan did not stab Mr. Stone. *See Jordan*, 594 F.3d at 1268.  We affirmed the district court's denial of Mr. Jordan's motion.  We reasoned that "[s]uch evidence would only show that Mr. Riker handled those items at some point, which is not at all inconsistent with the government's theory of

---

[5] At oral argument, Mr. Jordan's counsel conceded Dr. Miller's analysis could have been conducted at the time of trial.  He explained that the parties and the district court nevertheless agreed the analysis was "newly discovered evidence" for purposes of the Rule 33 hearing due to ineffective assistance of trial counsel.  In a post-trial affidavit, Mr. Jordan's trial counsel asserted he provided ineffective assistance in arguing to the jury that Mr. Riker was the killer without attempting to test whether his DNA matched the unknown DNA on the murder weapon.  We assume without deciding that Dr. Miller's DNA analysis was new evidence under these circumstances.

the case such that it calls into question the strength of the evidence against Mr. Jordan."

*Id.*

The same is true now. Mr. Riker stated repeatedly—both when confessing and withdrawing his confessions—that he touched the shank. The Government has never disputed this fact—neither at trial nor now. As a result, the new DNA analysis proves only old news; it in no way makes an acquittal more likely because it proves nothing more than an undisputed fact.

2. **Mr. Riker's Letters, Declaration, and Testimony**

As for Mr. Riker, his letters and testimony reveal multiple inconsistencies. Pre-trial, he asserted Mr. Jordan was the killer. Post-trial, he confessed to Mr. Jordan's counsel, recanted his confession, and then confessed again to Mr. Jordan's prosecutor. He then continued confessing to Mr. Jordan's counsel and signed a sworn declaration to that end. Next, he revoked his confession and announced he would plead the Fifth if called to testify at Mr. Jordan's Rule 33 hearing. He again reversed course, agreeing to testify at that hearing, during which he repeatedly stated that his previous confessions were lies and that Mr. Jordan stabbed Mr. Stone. In one instance, he testified his statement to Mr. Jordan's prosecutor that "I lied to you for obvious reasons," Aplt. Suppl. App., Vol. 1 at 1, was a "complete lie," adding, "I'm a liar," ROA, Vol. 4 at 110-11. He also explained that he falsely confessed in the first place because he thought he would be better off serving time as a murderer in federal prison than a child molester in state prison.

These inconsistencies and Mr. Riker's incentive to confess falsely led the district court to conclude Mr. Riker was "simply not credible in any respect." ROA, Vol. 1 at 3101, ¶ 13. We accept a district court's credibility determination unless it is clearly erroneous, for "'[o]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'" *Cannon v. Trammell*, 796 F.3d 1256, 1272 (10th Cir. 2015) (quoting *Anderson*, 470 U.S. at 575). "To be clearly erroneous, a finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer." *United States v. Quaintance*, 608 F.3d 717, 721 (10th Cir. 2010) (quotations omitted).

In light of the foregoing, we not only cannot conclude the court's credibility determination was clear error, we agree that Mr. Riker had "serious credibility problems such that neither his statements admitting to stabbing Stone [n]or his statements denying that he did so are credible." ROA Vol. 1 at 3090, ¶ 26. We conclude that the evidence regarding his confessions does not make Mr. Jordan's acquittal at a new trial probable.

3. **Trial Evidence**

Having examined Mr. Jordan's newly discovered evidence, we return to the evidence admitted at trial. Two inmates testified they saw Mr. Jordan stab Mr. Stone, after which Mr. Stone started running, and Mr. Jordan ran after him. A surveillance video and testimony from an assistant warden and two correction officers were consistent with the inmates' accounts. None of the newly discovered evidence undermines the jury's determination that the trial evidence proved Mr. Jordan's guilt beyond a reasonable doubt.

4. **No Abuse of Discretion**

In short, Mr. Jordan failed to show a jury would probably acquit him based on the new DNA analysis and Mr. Riker's statements, viewed alongside the trial evidence. The district court found the new DNA evidence to be cumulative—the evidence confirmed the undisputed fact established at trial that Mr. Riker had touched the shank. The court also found Mr. Riker incredible.

We see no clear error or abuse of discretion in the district court's making these findings or concluding no new trial is warranted. Its reference to the Government's evidence of Mr. Stone's dying declarations to reinforce this conclusion does not alter that Mr. Jordan could not show with his new evidence that he was entitled to a new trial.

The district court did not detect any support for a new trial in the Government's evidence. Any error the district court may have committed under Rule 33 in considering new government evidence was harmless because eliminating the Government's new evidence would not cure Mr. Jordan's failure to meet his burden with his own.[6]

We therefore affirm and decline Mr. Jordan's request to remand to the district court for further consideration of the new evidence.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Mr. Jordan's motion for a new trial.

---

[6] We are not convinced a harmless error analysis is needed to affirm because Mr. Jordan did not meet his burden based on his new evidence.