FILED
**United States Court of Appeals**
**Tenth Circuit**

**June 17, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ALVARO PABLO VELARDE,

    Defendant - Appellant.

No. 20-1115
(D.C. No. 1:18-CR-00525-CMA-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **MURPHY**, and **MORITZ**, Circuit Judges.
_____

A jury convicted Alvaro Pablo Velarde of three felony counts based on his rape of

a female first-year cadet when he was an exchange student at the U.S. Air Force

Academy in Colorado Springs.  Before sentencing, Mr. Velarde moved for a new trial,

claiming newly discovered evidence.  The district court denied the motion.

On appeal, Mr. Velarde contends (1) the district court erred in denying his new

trial motion, (2) the court should not have excluded his mother's proposed testimony that

she saw the victim, I.C., smiling and laughing outside the courtroom after I.C. testified at

trial, (3) the Government's exaggeration of its concussion expert's qualifications during

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

closing arguments and the court's failure to take corrective action constituted plain error, and (4) we should vacate the jury verdict because of cumulative errors. Exercising jurisdiction under 28 U.S.C. § 1291, we reject his arguments and affirm.

## I. PROCEDURAL HISTORY

### 1. Indictment

The grand jury indicted Mr. Velarde on two counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(a)(1) and (2), and one count of abusive sexual contact in violation of 18 U.S.C. § 2241(a)(1). These counts corresponded to different sexual acts and contact during the rape.

### 2. Trial

A jury convicted Mr. Velarde following a four-day trial. Both Mr. Velarde and I.C. testified.

#### a. *Government's case*

The Government's evidence detailed the rape and its aftermath. Mr. Velarde and I.C. were friends at the Academy. One night in his dorm room, Mr. Velarde tried to kiss I.C. She was already in a relationship and wanted to be no more than friends with Mr. Velarde. Carlos Hinojosa, Mr. Velarde's friend and roommate, entered the room and interrupted the attempted kiss.

The next afternoon, Mr. Velarde went to I.C.'s dorm room. He asked whether her roommate was there, and I.C. confirmed she was not. I.C. tried to set boundaries with Mr. Velarde in light of the previous night's events, and he became angry. She thrice asked Mr. Velarde to leave, but he did not. Mr. Velarde undressed I.C. as she repeatedly

2

said they "shouldn't be doing this," said "no," and said she had to leave for judo practice. Mr. Velarde then forcibly raped I.C. and caused I.C. to hit her head.

I.C.'s fellow cadets accompanied her to the hospital. She had trouble walking and sitting. She seemed distraught, flustered, and confused. A forensic nurse examiner at the hospital found injuries consistent with rape.

At the hospital, I.C. at first submitted a "restricted" report about the rape, which entitled her to counseling and medical care. But unlike an "unrestricted" report, the restricted report would not have triggered an investigation by law enforcement or the Academy. Shortly afterward, she converted the report to an "unrestricted" one because she feared Mr. Velarde.

After I.C. was discharged from the hospital, she sat and waited outside with a fellow cadet for a ride back to the Academy. As they waited, she told him the light on the emergency room sign hurt her eyes and head. During the ride, she said the headlights of other cars hurt her head.

I.C.'s roommate returned to their dorm room before I.C. returned from the hospital. She noticed that the room was "abnormal[ly]" disordered given the strict rules for room upkeep at the Academy. App. at 395. Although the roommate tidied up because she didn't want I.C. to return to "a room that was messed up," she "felt like it could be the scene of a crime" and took photos. *Id.* at 396. When I.C. returned, the roommate observed that she appeared "[d]estroyed. Like . . . she looked like she had the worst day of her life; mentally, physically, emotionally, everything." *Id.* at 398.

3

For about a week, I.C. lived away from the Academy with her local "sponsor family." When she returned, Dr. Jonathan Jackson, a concussion doctor, examined her. He performed a battery of tests and asked I.C. to describe her symptoms. Among other symptoms, she reported light sensitivity. I.C. told Dr. Jackson that during the rape, her head had hit the bed frame and/or the wall. Dr. Jackson diagnosed her with a concussion. In making this diagnosis, he consulted baseline tests that I.C. took when she arrived at the Academy to measure her normal functioning. I.C. believed Mr. Velarde had caused the concussion during the rape and that she had not sustained it during a preceding judo practice.

I.C. experienced lasting anguish and trauma after the rape. Other cadets corroborated that her demeanor changed, various stimuli frightened her, and she sometimes cried alone.

b. *Mr. Velarde's defense*

Mr. Velarde testified that before the rape, his relationship with I.C. was more than a friendship—they had kissed, cuddled, and been flirtatious. He said he did not rape her and that the sex was consensual. He stated I.C. eventually told him to stop having sex with her and to leave the room, which he did. Mr. Velarde also presented testimony from other witnesses, mostly fellow cadets, corroborating that he and I.C. had a flirtatious relationship before the rape and appeared to be more than simply friends.

c. *Trial events*

Two events during trial are particularly relevant to this appeal. First, Mr. Velarde proffered that his mother would testify that after I.C. testified, she saw I.C. with others

4

outside the courtroom, and I.C. was smiling and laughing.  The district court sustained the Government's objection to this testimony.  Second, the Government's closing arguments exaggerated Dr. Jackson's credentials.  Mr. Velarde did not object, however, and the district court did not take corrective action.

3. **Motion for a New Trial**

Before sentencing, Mr. Velarde moved for a new trial, alleging newly discovered evidence.  The district court denied the motion.

4. **Sentence**

The district court sentenced Mr. Velarde to 60 months on each of the three counts, to be served concurrently.

## II. DISCUSSION

On appeal, Mr. Velarde primarily challenges the district court's denial of his new trial motion, which he based on alleged newly discovered evidence.  He also argues the district court erred when it excluded his mother's testimony, and plainly erred by failing to take corrective action when the Government exaggerated Dr. Jackson's credentials during closing arguments.  He concludes by arguing cumulative error.  We reject these arguments and affirm.

### A. *New Trial Motion Based on Newly Discovered Evidence*

Mr. Velarde based his new trial motion on (a) statements by Mr. Hinojosa; (b) I.C.'s diagnosis with post-traumatic stress disorder ("PTSD"); and (c) post-trial statements by Lillian Landis, a cadet who became close with I.C. after the rape.

1. **New Trial Standards and Standard of Review**

Federal Rule of Criminal Procedure 33(a) provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A defendant may move for a new trial based on newly discovered evidence, but such a motion "is not favorably regarded and should be granted only with great caution." *United States v. Jordan*, 806 F.3d 1244, 1252 (10th Cir. 2015) (quotations omitted).

We apply a five-element test to determine whether a new trial is warranted based on new evidence:

> To prevail, a defendant must prove: (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.* (quotations omitted). Because "[a] motion for a new trial is based on the presumption that the verdict against the defendant is valid[,] . . . the burden is on the defendant . . . ." 3 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 581 (4th ed., Oct. 2020 update).

"We review a district court's denial of a motion for a new trial for abuse of discretion." *United States v. Wagner*, 951 F.3d 1232, 1254 (10th Cir. 2020). An abuse of discretion "occurs when the district court's decision is arbitrary, capricious, whimsical, or manifestly unreasonable." *Jordan*, 806 F.3d at 1252 (quotations omitted). We must give the district court "broad discretion because its vantage point as to the determinative

6

factor—whether newly discovered evidence would have influenced the jury—has been informed by the trial over which it presided." *Id.* (quotations omitted).

2. **Analysis**

To support his motion for new trial, Mr. Velarde presented various instances of alleged new evidence. In each instance, the alleged new evidence failed to meet one or more of the five elements listed above.

a. *Mr. Hinojosa's statements*

Mr. Hinojosa, Mr. Velarde's roommate and friend at the Academy, did not testify at trial. Mr. Velarde argues Mr. Hinojosa made five post-trial statements that warranted a new trial.

i. Mr. Hinojosa's subjective beliefs about Mr. Velarde's guilt

Before trial, Mr. Hinojosa said he believed Mr. Velarde was guilty. In a post-trial interview with Mr. Velarde's counsel, Mr. Hinojosa said he no longer held that belief. Because Mr. Hinojosa's subjective views about Mr. Velarde's guilt or innocence are inadmissible, *United States v. Brooks*, 736 F.3d 921, 931 n.2 (10th Cir. 2013); *United States v. Barbee*, 968 F.2d 1026, 1031 (10th Cir. 1992), his post-trial statement is immaterial to the principal issues involved (element 4) and would not probably produce an acquittal (element 5).

ii. I.C.'s incentive not to recant

In the post-trial interview, Mr. Hinojosa said that once I.C. reported the rape, she was deterred from recanting because doing so would have exposed her to discipline at the Academy.

7

Even if this speculative statement were admissible, it would be merely impeaching of I.C.'s credibility (element 3). *See United States v. Watson*, 766 F.3d 1219, 1244 (10th Cir. 2014) ("[S]ubstantive evidence is that which is offered to help establish a fact in issue, while impeachment evidence is offered to undermine a witness's credibility . . . ." (citation and quotations omitted)).

Also, Mr. Velarde has not shown that Mr. Hinojosa's statement would probably produce an acquittal at a new trial (element 5). At trial, Mr. Velarde presented extensive testimony and argued during closing argument that, given the Academy's cadet honor code, I.C. might have faced repercussions if she recanted her report. App. at 238-39, 531, 548-49, 561, 579, 595-97, 616-17, 689-90. Mr. Hinojosa's statement would thus be cumulative.

### iii. I.C.'s telling many people about the rape

In the post-trial interview, Mr. Hinojosa stated that I.C. told many people about the rape. Mr. Velarde again offers no reason why this statement would be admissible as substantive proof of Mr. Velarde's innocence, let alone impeaching (element 3). Nor does he explain how this statement would be material to the principal issues involved (element 4). He also has not shown that the statement would probably produce an acquittal at a new trial (element 5).

### iv. I.C.'s "hid[ing]" text messages from Mr. Hinojosa

After trial, Mr. Hinojosa made a video call to Mr. Velarde, who was in jail. During that call and also during the post-trial interview, Mr. Hinojosa said I.C. had "hid[den]" certain text messages from him that she had exchanged with another cadet,

8

Thomas Ingram, one of I.C.'s Academy friends. App. at 38. In these messages, I.C. had told Mr. Ingram before the rape that she had nearly kissed Mr. Velarde and that she was in a "predicament" because she was attracted to Mr. Velarde. *See id.* at 212-15.[1]

Mr. Velarde has not explained why Mr. Hinojosa's statement is relevant, even as merely impeaching evidence (element 3); why it is material to the principal issues involved (element 4); or why it probably would produce an acquittal at a new trial (element 5). At trial, the text messages were published to the jury, and I.C. was questioned at length about them. Mr. Velarde now seems to imply that I.C.'s "hid[ing]" the text messages from Mr. Hinojosa undermines her credibility. But Mr. Velarde offers no basis for such speculation, and I.C.'s conduct supports other inferences. For example, a reasonable juror could infer that I.C.'s conduct was consistent with avoiding contact with Mr. Velarde's close friends, including Mr. Hinojosa.

     v.   <u>Whether Mr. Velarde told Mr. Hinojosa I.C. said "no" multiple times</u>

Before trial, Mr. Hinojosa said Mr. Velarde had told him that I.C. had said "no" multiple times during the rape. After trial, in the jailhouse video call and the post-trial

---

[1] At trial, I.C. testified that she deleted the text messages from her phone after the rape because she "was disgusted that [she] ever had positive feelings toward [Mr. Velarde], and [she] didn't want to see [the messages] after what [Mr. Velarde] did." App. at 250. Despite deleting the messages, I.C. told Air Force investigators about the messages, obtained screenshots of them from Mr. Ingram, and provided the screenshots to the investigators. *Id.* at 250-51. Given that Mr. Hinojosa was neither an investigator nor a participant in the text message conversations between I.C. and Mr. Ingram, we are unsure what Mr. Hinojosa meant when he said I.C. "hid" the text messages from *him*. *Id.* at 38.

interview, Mr. Hinojosa said Mr. Velarde had not told Mr. Hinojosa that I.C. said "no." Rather, Mr. Hinojosa said Mr. Velarde told Mr. Hinojosa that I.C. said "it's not correct."

If offered by Mr. Velarde, Mr. Hinojosa's statement that Mr. Velarde told him that I.C. said "it's not correct" would be inadmissible hearsay. Fed. R. Evid. 801(c). Even if this statement were admissible, Mr. Velarde has not shown Mr. Hinojosa's statement would probably produce an acquittal at a new trial (element 5). It would have minimal probative value and also would be cumulative because Mr. Velarde testified at trial that he did not tell Mr. Hinojosa that I.C. said "no." App. at 508-09. Indeed, I.C.'s saying "it's not correct" would support the Government's case by showing I.C. did not consent.

### vi. Mr. Hinojosa's pretrial statements

In addition to these five post-trial statements, Mr. Velarde also points to two pretrial statements by Mr. Hinojosa that he claims would have favored Mr. Velarde if Mr. Hinojosa had testified at trial. Aplt. Br. at 52-55. Mr. Hinojosa said that (1) before the rape, he observed Mr. Velarde and I.C. cuddling and watching a movie; and (2) the night before the rape, when Mr. Hinojosa opened the door to his shared dorm room, Mr. Velarde and I.C. were on the floor with their heads close together and then rapidly pulled apart. *See id.* at 52; App. at 31-33.

Mr. Velarde concedes these two statements are not newly discovered evidence. *See* Aplt. Br. at 53. But he insists that the interests of justice require us to grant a new trial so he can call Mr. Hinojosa as a witness to give these statements. Mr. Velarde claims he did not call Mr. Hinojosa as a trial witness to present these statements because the Government could have cross-examined Mr. Hinojosa about Mr. Velarde's having

10

told him that I.C. said "no" multiple times. But because Mr. Hinojosa's post-trial statements have dissipated this risk, Mr. Velarde now wishes to call Mr. Hinojosa to testify about his pretrial statements.

Although a court can grant a new trial for various reasons to prevent a miscarriage of justice, *see McHargue v. Stokes Div. of Pennwalt Corp.*, 912 F.2d 394, 396 (10th Cir. 1990) (A district judge "has the obligation or duty to ensure that justice is done, and, when justice so requires, he has the authority to set aside the jury's verdict."); Fed. R. Crim. P. 33(a), Mr. Velarde has not satisfied this standard.

Mr. Velarde's inability to present Mr. Hinojosa's two pretrial statements did not undermine his defense. The statements would have been cumulative of other evidence presented at trial. Mr. Velarde published to the jury text messages between him and I.C. in which she acknowledged having cuddled with him. App. at 239-40, 463-65. He also presented testimony from other cadets who saw him and I.C. in close physical contact in the Academy's library, *id.* at 541-44, 553-56, and dancing in an intimate fashion at a ballroom, *id.* at 629-31, before the rape. I.C. testified that the night before the rape, she and Mr. Velarde were lying close to each other on the floor, Mr. Velarde leaned in to kiss her, and they were interrupted when Mr. Hinojosa opened the door. *Id.* at 144-46. The Government repeatedly acknowledged in its closing arguments that I.C. and Mr. Velarde flirted and had a close relationship before the rape. *Id.* at 648, 665-66, 693-94.

Thus, even if Mr. Hinojosa's two pretrial statements showed a close relationship between Mr. Velarde and I.C., the statements would not have significantly affected the jury's analysis of the central issue: what happened in the room when Mr. Velarde raped

11

I.C.  We conclude the absence of Mr. Hinojosa's two pretrial statements from the trial did not cause a miscarriage of justice that would call for a new trial.[2]

* * * *

The district court did not abuse its discretion by denying Mr. Velarde's new trial motion based on Mr. Hinojosa's statements.

b. *I.C.'s PTSD diagnosis*

Mr. Velarde argues he should have a new trial because he learned only after trial that I.C. had been diagnosed with PTSD.  We disagree.

Mr. Velarde has not shown that his failure to learn about the diagnosis "was not caused by [his] own lack of diligence" (element 2).  *See Jordan*, 806 F.3d at 1252.  The Government disclosed ample evidence to Mr. Velarde during discovery that I.C. had experienced mental and emotional health symptoms after the rape.  Due diligence likely would have led to discovery of the PTSD diagnosis.  Also, Mr. Velarde does not explain why I.C.'s PTSD diagnosis is substantive rather than impeachment evidence (element 3).  Further, I.C.'s PTSD diagnosis is immaterial to the principal issues involved (element 4).  Finally, Mr. Velarde has not demonstrated that if evidence of I.C.'s PTSD diagnosis were introduced at a new trial, it would probably produce an acquittal (element 5).  Based on

---

[2] These arguments for a new trial motion based on the pretrial statements might also be untimely.  Under Federal Rule of Criminal Procedure 33(b), any new trial motion not "grounded on" new evidence must be brought within 14 days of the verdict.  Mr. Velarde moved for a new trial outside this time period.  We need not decide whether Mr. Velarde can overcome this potential obstacle by linking Mr. Hinojosa's pretrial statements with his post-trial statements.

12

the evidence that I.C. exhibited a marked change in demeanor after the rape, reasonable jurors could conclude I.C. developed PTSD after and because of the rape.

The district court thus did not abuse its discretion by denying Mr. Velarde's new trial motion to the extent it was based on I.C.'s PTSD diagnosis.

c. *Lillian Landis's post-trial statements*

Mr. Velarde contends a new trial was warranted because of post-trial statements by Ms. Landis, a cadet who became close to I.C. after the rape and before the trial. We disagree because Mr. Velarde has not shown that Ms. Landis's testimony is not merely impeaching (element 3), is material to the principal issues involved (element 4), or would probably have produced an acquittal (element 5).

According to Mr. Velarde, Ms. Landis would testify at a new trial that:

- She did not know I.C. well before the rape.

- Shortly after the rape, I.C. started speaking with her.

- I.C. told her she had suffered a concussion during the rape because she hit her head on the bed.

- Before the trial, I.C. told Ms. Landis she was following Mr. Velarde's prosecution on the Internet and told her details about the case.

- I.C. told Ms. Landis she was disgusted with Mr. Velarde's counsel.

- I.C. told Ms. Landis she initially decided to file a restricted report and later decided to convert it into an unrestricted report.

- I.C. never cried in Ms. Landis's presence.

- After the trial, Ms. Landis and I.C. did not talk much.

13

At most, these statements concern only I.C.'s credibility and are not substantive proof of Mr. Velarde's guilt or innocence (element 3).[3] It is not even clear that Ms. Landis's statements would be admissible for impeachment purposes. In fact, most of Ms. Landis's statements are immaterial (element 4).

Also, Mr. Velarde has not shown Ms. Landis's testimony probably would have produced an acquittal (element 5). He argues I.C.'s statement to Ms. Landis that she hit her head on the bed is inconsistent with her trial testimony and statements to Air Force investigators that Mr. Velarde hit the back of her head during the rape. But Mr. Velarde could have hit I.C.'s head *and* caused I.C.'s head to hit the bed. Indeed, Dr. Jackson testified that I.C. had reported to him that her head was hit multiple times during the rape. App. at 366. Also, based on I.C.'s testimony that she lost consciousness during the rape

---

[3] This includes Ms. Landis's statement that I.C. said she hit her head on the bed during the rape, which Mr. Velarde repeatedly emphasized during oral argument as substantively "corroborating" his testimony that he did not hit I.C. in the head. Oral Arg. at 7:16-8:39, 9:25-11:30.

Ms. Landis's statement would be inadmissible hearsay—an out-of-court statement offered to "prove the truth of the matter asserted in the statement," *see* Fed. R. Evid. 801(c)(2)—unless the statement is "not hearsay" under Federal Rule of Evidence 801(d) or falls within a hearsay exception. Mr. Velarde cannot introduce this statement under Federal Rule of Evidence 801(d)(1)(A) as a prior non-hearsay statement by a declarant-witness. That provision requires the prior statement to have been "given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." Fed. R. Evid. 801(d)(1)(A). I.C.'s statement to Ms. Landis was not made under such circumstances. Nor does Mr. Velarde identify a hearsay exception that would apply to the statement. The Federal Rules of Evidence thus would not allow Ms. Landis's statement as substantive evidence.

The statement may possibly be used as impeachment evidence under Federal Rule of Evidence 613. "But a prior statement offered for impeachment purposes is admissible only to show that the speaker is not worthy of belief; it is not received for the truth of the matter asserted." *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 651 (10th Cir. 2008).

14

and did not immediately remember having been hit on the head, *id.* at 228, reasonable jurors could have excused any lack of precision in I.C.'s recollection of how Mr. Velarde caused her head to be hit.

The district court did not abuse its discretion by denying Mr. Velarde's new trial motion to the extent it was based Ms. Landis's post-trial statements.

\* \* \* \*

The district court thus did not abuse its discretion by denying Mr. Velarde's new trial motion.[4]

## B. *Exclusion of Mr. Velarde's Mother's Testimony*

Mr. Velarde's mother watched the trial. On the third day, after I.C. finished testifying, Mr. Velarde proffered testimony that:

> [His mother] recognized the alleged victim on the stand, [Ms. Velarde's mother] [was] outside [either the courtroom or the courthouse] in the area there, and she saw the alleged victim come out and appear to be very happy and smiling and laughing with classmates or whoever they are, they appear to be classmates.

App. at 425-26. The district court sustained the Government's objection to the testimony on multiple grounds, including Federal Rule of Evidence 403. Rule 403 allows a court to

---

[4] In the alternative, Mr. Velarde argues that even if we do not reverse the district court's denial of his new trial motion, we should vacate and remand with directions for the court to hold an evidentiary hearing on his motion. We have held that a district court should hold an evidentiary hearing on a new trial motion when a hearing is necessary to evaluate the "credibility" and "impact" of new evidence. *See United States v. Page*, 828 F.2d 1476, 1478 (10th Cir. 1987); *accord United States v. Miller*, 987 F.2d 1462, 1466 (10th Cir. 1993). Here, no evidentiary hearing was needed to make these determinations.

"exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The court reasoned that the mother's testimony had little or no probative value, and that any probative value was substantially outweighed by the prospect of a time-consuming "mini-trial" about what the mother witnessed. On appeal, Mr. Velarde argues that the court erred because I.C.'s laughing and smiling with classmates showed she testified falsely. We review for an abuse of discretion. *See United States v. Chavez*, 976 F.3d 1178, 1193 (10th Cir. 2020).

We agree with the district court that the probative value of the mother's testimony was minimal and substantially outweighed by the inefficiency and delay associated with a "mini-trial" about I.C.'s laughing and smiling. If Mr. Velarde had presented his mother's testimony, the Government would likely have recalled I.C. and called her friends as witnesses to testify about how much time had elapsed between I.C.'s leaving the stand and the mother's observing her; what happened between I.C. leaving the stand and the mother observing her; and what I.C. and her friends were talking about. The court did not abuse its discretion by avoiding such a "mini-trial" given the minimal probative value of the mother's testimony. We affirm the district court based on Rule 403.

C. *Government's Exaggeration of Dr. Jackson's Qualifications*

1. **Additional Procedural Background**

Dr. Jackson testified as a concussion expert. His qualifications included published concussion research, serving as the Air Force Academy's co-principal investigator for an

8-year, 30-university study on concussions in college athletes, and having treated over

1,000 concussion patients.  Mr. Velarde contends the Government exaggerated Dr.

Jackson's qualifications during closing arguments by saying:

1. Dr. Jackson was "one of the preeminent concussion doctors in the United States."  App. at 659.

2. Dr. Jackson was "the leading concussion expert."  *Id.* at 701.

3. Dr. Jackson was "a principal researcher" of the 30-university study (rather than a co-principal investigator for the Air Force Academy).  *Id.* at 659.

4. The study was "one of the biggest concussion studies that has ever been conducted."  *Id.*

5. The study was "the largest study on concussions."  *Id.* at 701.[5]

2. **Legal Standards**

Improper statements by prosecutors can violate "a defendant's due process rights

if [they] infect[] a trial with unfairness and den[y] the defendant the right to a fair trial."

*United States v. Currie*, 911 F.3d 1047, 1055 (10th Cir. 2018).  "The misconduct analysis

proceeds in two steps:  (1) we decide whether the prosecutor's comments were improper,

and (2) if they were, we examine the likely effect of the comments on the jury's verdict."

*Id.*

"Prosecutorial misconduct can include various types of improper comments at

trial."  *Id.*  A prosecutor's statements during closing arguments must be confined to

---

[5] The Government argues that the first, third, and fourth statements were supported by the record, but it concedes that the second and fifth statements were exaggerations. We need not resolve the parties' dispute about which of the five statements may have been improper.

17

record evidence and to reasonable inferences that may be drawn from that evidence. *United States v. Lopez-Medina*, 596 F.3d 716, 740 (10th Cir. 2010) (emphasis added).

"When considering improper prosecutor comments on appeal, the appropriate standard of review depends on whether the defendant objected at trial and how the court responded." *Currie*, 911 F.3d at 1056. If, as here, "the defendant does not object at trial but raises the issue on appeal," we apply plain error review. *Id.* at 1057. Under plain error review, the defendant must show that (1) "the prosecutor's statement is plainly improper" and (2) "the improper statement affected his or her substantial rights." *United States v. Anaya*, 727 F.3d 1043, 1053 (10th Cir. 2013) (quotations omitted).

### 3. Analysis

The Government acknowledges it exaggerated the qualifications of its concussion expert, Dr. Jackson, during closing arguments. Mr. Velarde did not object. We review for plain error.

Even assuming the closing argument statements were "plainly improper" exaggerations, Mr. Velarde has not shown that any "improper statement[s] affected his . . . substantial rights," *Anaya*, 727 F.3d at 1053, that is, "affected the outcome of the district court proceedings," *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (quotations omitted). His sole argument is that the prosecution's exaggeration must have affected the outcome because the trial was a "close[] . . . case." Aplt. Br. at 72-73. This argument is unpersuasive.

18

First, Mr. Velarde never seriously contested Dr. Jackson's credibility at trial. Also, Mr. Velarde did not offer a competing expert, which would have required the jury to assess which expert was more credible.

Second, Dr. Jackson's testimony was substantially consistent with Mr. Velarde's defense argument that I.C. could have faked her concussion or sustained it at a judo practice before the rape. *See* App. at 674-77 (Mr. Velarde's closing arguments). Dr. Jackson acknowledged that I.C. could have faked a concussion, *id.* at 375, that his diagnosis of I.C. was based partly on her self-reported symptoms, *id.* at 365-69, and that she could have sustained the concussion at judo practice, *id.* at 376.

Although the Government exaggerated Dr. Jackson's qualifications during its closing arguments, Mr. Velarde has not shown plain error.

## D. *Cumulative Error*

We reject Mr. Velarde's cumulative-error argument because he has not identified any errors. *See Lopez-Medina*, 596 F.3d at 741.

## III. **CONCLUSION**

We affirm the district court's judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

19